**Charles L. JONES, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 10983.**

District of Columbia Court of Appeals.

Argued Nov. 16, 1977.

Decided April 20, 1978.

Ladd B. Leavens, Public Defender Service, Washington, D. C., with whom Warren C. Nighswander and Silas J. Wasserstrom, Public Defender Service, Washington, D. C., were on brief, for appellant.

Edward D. Ross, Jr., Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty. and John A. Terry, Asst. U. S. Atty., Washington, D. C., were on brief, for appellee.

Before KERN, YEAGLEY and FERREN, Associate Judges.

FERREN, Associate Judge:

Charles L. Jones appeals his conviction upon a jury verdict for second-degree murder (D.C.Code 1973, § 22–2403) and carrying a pistol without a license (D.C.Code 1973, § 22–3204). He contends that he was denied a fair trial for two reasons: (1) the court permitted his former girlfriend to

---

provide highly prejudicial testimony, without probative value, that appellant was using drugs at the time of the murder and had done so on previous occasions; and (2) the trial judge frequently interjected himself into the proceedings in ways substantially prejudicial to appellant. We reverse on the first ground. (We do not reach the second.)

## I.

Some time after noon on September 16, 1975, Richard Wilson was fatally shot in the head from close range while seated inside an automobile parked in front of 1531 Gales Street, N.E. The government's principal witness at trial, Mr. Susmana Jones, testified that as he went outside his home at 1527 Gales Street, N.E., at approximately 12:15 p.m. to bring in his daughter (who was playing across the street) for lunch, three cars passed him and pulled to the side of the road. Having crossed the street and taken hold of his daughter's hand, Mr. Jones heard a noise that sounded "like a firecracker," which seemed to come from the first car. As the third car backed entirely out of the block, Mr. Jones saw a man, whom he later described to police, "jump out of the passenger side of the first car and run back and jump into the passenger side of the second car." Because he "felt suspicious," Mr. Jones wrote the license number of the second car on an envelope he had been carrying in a pocket, just as the second car was driving away. At trial, Mr. Jones recalled the car as being purple or maroon-over-grey, although there was testimony to indicate that he had described it to investigating officers as a purple-over-white hardtop.

After the second car had driven away, Mr. Jones saw the decedent slumped over the wheel of the first car. When metropolitan police officers arrived at the scene, Mr. Jones told them what he had observed. He testified that he had not been able to recite the tag numbers from memory, so he had gone back to the kitchen of his home to consult the envelope before he gave the numbers to the police.

Appellant, along with a codefendant (for whom the trial court sustained a motion for judgment of acquittal at the close of the government's case), was arrested at 1:10 p.m. on the same day, less than an hour after the shooting. The police seized him in front of 3600 Ely Place, S.E., where they had noticed his car, a maroon-over-silver 1974 Oldsmobile convertible with tag numbers identical to those reported by Mr. Jones. Police officers took the car and the two suspects to Gales Street, where Mr. Jones identified appellant as the man who had jumped out of the first car and into the second car. Mr. Jones also identified the car. Both at the time of this showup and also at a subsequent lineup, however, Mr. Jones told police that he was not sure of his identification. The government did not ask him to make an in-court identification.

Vivian Brockenbury, appellant's girlfriend, testified that she had been living with appellant at 1009 E Street, N.E., for approximately one month before the shooting. On the day after appellant's arrest, she went to court with appellant's mother and sister to help arrange for his release on bail. After this release was accomplished, Ms. Brockenbury drove with appellant to the house on E Street to pick up some of his clothes. They were accompanied by his codefendant and his common-law wife, who had also come to court to assist. Ms. Brockenbury testified that while inside the E Street house appellant had shown her a small handgun wrapped in cloth and asked her to get rid of it, which she had refused to do. She also claimed that both the cloth and the gun had been stained with a small amount of blood (which the government maintained was the result of "blowback" from the wound inflicted upon decedent at close range).

The defense case consisted primarily of testimony by the appellant and his mother. They testified that appellant had spent the entire morning of September 16, 1975, driving his mother to various locations where she investigated three job possibilities. In addition, they attempted to discredit Ms. Brockenbury by characterizing her testimo-

ny as an attempt to gain revenge for appellant's decision to move out of the house on E Street and return to his common-law wife.

Jury trial commenced on April 21, 1976. On April 23, 1976, appellant Jones was found guilty of second-degree murder and carrying a pistol without a license, for which he was sentenced to concurrent terms of 15 to 45 years and one year, respectively. (The government dismissed a charge of second-degree murder while armed.)

## II.

In the course of Ms. Brockenbury's testimony during the government's case-in-chief, the prosecutor asked her whether "specifically around the time of September 1975 she had ever seen appellant use narcotics." The court allowed her to respond that she, on occasion, had observed appellant shooting narcotics into his arm with a needle. She further testified over defense objection that she had financed appellant's drug purchases and, on a number of occasions, had accompanied him to purchase drugs at the Ely Place address where the arrest had taken place.

Once the narcotics issue was before the jury, appellant sought to refute Ms. Brockenbury through the testimony of Ms. Karen Green, an employee of the Narcotics Treatment Administration. Ms. Green testified that appellant had been tested for drug use when first brought to court in September, 1975, and that the results had been negative, indicating no drug use during at least the three days prior to the testing. On cross-examination, however, the court permitted the prosecutor to bring out the fact that appellant had admitted to Ms. Green his use of heroin in 1970.

Appellant contends that the evidence concerning his drug use probed no legitimate issue, that it strongly suggested this case involved a drug-related murder (of which there was no direct evidence), and that the prejudice resulting from its admission was accordingly so severe that appellant's conviction must be reversed.

The government counters, first, that appellant did not preserve this issue for appeal. More particularly, defense counsel did not move to strike the drug-related testimony or request cautionary instructions to the jury; he elected instead to challenge the truth of this evidence directly by calling Ms. Green to the stand. The government argues that appellant accordingly waived his objection to the drug-related evidence.

■ The government's contention has no merit. Appellant did all he needed to do—object to presentation of the evidence and ask to approach the bench to explain the objection. His decision to rebut the evidence, after making an effort to keep it out of the trial, cannot be deemed an endorsement of the propriety of that evidence. *Cf. Williams v. United States,* D.C.App., 382 A.2d 1, 7 (1978) (failure of defense counsel to accept prosecutor's offer to suggest non-prejudicial mode of introducing "mug shots" of defendant was not waiver of objection to "mug shot" evidence).

We turn, then, to the merits of the asserted error. We have long observed the rule that unless and until a defendant takes the stand or otherwise places his character in issue, evidence of a defendant's prior illegal activity is generally inadmissible because of its prejudicial impact.

> It is a principle of long standing in our law that evidence of one crime is inadmissible to prove *disposition* to commit crime, from which the jury may infer that the defendant committed the crime charged. [*Drew v. United States,* 118 U.S.App.D.C. 11, 15, 331 F.2d 85, 89 (1964) (footnote omitted).]

There is, however, a limited number of exceptions to this principle for situations in which "other crimes" evidence concededly has more probative value than prejudicial impact.

> Evidence of other crimes is admissible when relevant to (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one

tends to establish the other, and (5) the identity of the person charged with the commission of the crime on trial. When the evidence is relevant and important to one of these five issues, it is generally conceded that the prejudicial effect may be outweighed by the probative value. [*Id.,* at 16, 331 F.2d at 90; footnote omitted.]

See *Miles v. United States,* D.C.App., 374 A.2d 278, 282–83 (1977); *Light v. United States,* D.C.App., 360 A.2d 479, 480 (1976).

The government does not contend that the evidence showing Ms. Brockenbury's knowledge and support of appellant's drug habit fits any of the *Drew* exceptions. The government argues, rather, that these exceptions should not be deemed exclusive, and that the narcotics evidence served another "substantial, legitimate purpose." *Drew, supra,* 118 U.S.App.D.C. at 16, 331 F.2d at 90. It provided relevant background about appellant's and Ms. Brockenbury's relationship, making plausible her testimony that appellant sought her help in disposing of the murder weapon.

█ Even if we were not to limit admission of "other crimes" evidence to the *Drew* exceptions, we do not agree that the narcotics evidence had probative value outweighing its obvious prejudice. The government has not claimed that the murder was connected to narcotics. By informing the jury about appellant's drug use, however, including the graphic description of injection with a needle, Ms. Brockenbury's testimony easily permitted the jury to infer that appellant had a general disposition to commit crime and, more particularly, that this was a drug-related murder. The prejudice to ap-

pellant from such an inference surely far outweighed any enhancement of Ms. Brockenbury's credibility from this testimony, for her relationship as appellant's girlfriend had already been established.

In an effort to minimize the prejudice, the government's brief acknowledges, in effect, that a factfinder could not properly utilize the narcotics evidence in considering whether to convict for murder. "The crime itself—possession of narcotics—hardly was one that evinced a disposition or even a capacity to commit murder—the offense with which appellant was charged." And yet that is precisely the point: while admitting the irrelevance of the narcotics to the murder, the government nevertheless would have us risk a jury inference of general criminal disposition, including a propensity to commit murder, based on wholly unrelated criminal activity. It is precisely the risk of such an inference that the *Drew* principle seeks to eliminate, absent the probative value reflected in *Drew's* five specific exceptions. *See Miles v. United States, supra* at 282.[1]

█ We should note, finally, that the government does not attempt to justify Ms. Brockenbury's testimony on the ground that defendant's decision to take the stand legitimated her testimony retroactively on an impeachment theory. As indicated earlier, appellant's decision to try to meet the government's narcotics evidence by calling a witness, Ms. Green, did not waive his objection to that evidence. Similarly, appellant's decision to take the stand did not open the door retroactively for use of otherwise improper evidence, even for impeachment.[2]

1. Evidence "to show a mere propensity or disposition on the part of the defendant to commit a crime" is also barred by the more flexible "other crimes" rule cited by the government. *United States v. Woods,* 484 F.2d 127, 134 (4th Cir. 1973), *cert. denied,* 415 U.S. 979, 94 S.Ct. 1566, 39 L.Ed. 875 (1974).

2. If the government had sought to utilize the narcotics evidence strictly for impeachment purposes after Mr. Jones had taken the stand, there would have been significant hurdles to doing so. For example, if the government had

attempted to use Ms. Brockenbury's testimony to refute Mr. Jones' story that he had gone to 3600 Ely Place to visit another woman, then the government would have had to overcome an argument that "impeachment of witnesses by otherwise inadmissible evidence" cannot be accomplished when that evidence is directed to "collateral issues." *Lee v. United States,* 125 U.S.App.D.C. 126, 129, 368 F.2d 834, 837 (1966). *See Ewing v. United States,* 77 U.S. App.D.C. 14, 21, 135 F.2d 633, 640 (1942), *cert. denied,* 318 U.S. 776, 63 S.Ct. 829, 87 L.Ed. 1145 (1943); 2 Torcia, Wharton's Criminal Evi-

## III.

It is important to add that the record of the trial court proceedings indicates the judge paid little heed to the salutary warning almost a decade ago that "[t]he issue of narcotics use is one that may properly be handled with some sensitivity lest it result in undue and unnecessary prejudice." *United States v. Kearney,* 136 U.S.App.D.C. 328, 332, 420 F.2d 170, 174 (1969). The trial court repeatedly rejected requests by counsel for appellant and the government for bench conferences to explain, respectively, their objections to and arguments for the admission of this evidence. In the absence of guidance from the bench, confusion and error were virtually inevitable.

At one point, the prosecutor asked Ms. Brockenbury how the appellant had injected his drugs; she confirmed that they had been "placed into his arm with a needle." The court then sustained an objection by defense counsel to "this line of questioning." Nonetheless, the prosecutor (whose request for a bench conference at that point was refused) launched into a series of questions about the 3600 Ely Place address, ending with Ms. Brockenbury's statement that she had accompanied appellant there to make drug purchases. Apparently, the prosecutor had wanted to clarify at a bench conference whether the court had sustained an objection merely to the inflammatory line of questioning about the mode of nar-

cotics injection or to the broader area of inquiry about narcotics activity at the Ely Place address. The court's decision not to hear his inquiry forced the prosecutor to make a judgment that brought further error into the trial.

██ We recognize the responsibility of the trial court to conduct matters before it in an open and expeditious manner; but in most instances trial courts ought to listen to a proffer of "other crimes" and "narcotics use" evidence out of the hearing of the jury before ruling on its admissibility. *United States v. Bailey,* 164 U.S.App.D.C. 310, 505 F.2d 417 (1974), *cert. denied,* 420 U.S. 961, 95 S.Ct. 1350, 43 L.Ed.2d 438 (1975); *United States v. Kearney, supra.* Had the trial court done so here, much of the prejudice resulting from the admission of narcotics evidence in this murder case might have been avoided.

██ In summary, the evidence relating appellant to illegal use of drugs, which had no proffered (let alone established) connection to the murder, had little probative value in comparison with its highly prejudicial impact. The admission of this evidence was error. Because we cannot say that the jury "was not substantially swayed by the error," *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946), the error was not harmless.[3] The

dence § 423 (13th ed. 1972); 1 Underhill, Criminal Evidence § 239 (5th ed. 1956); 3A Wigmore, Evidence §§ 1000–1003 (Chadbourn rev. 1970).

If the government, more broadly, had proffered the narcotics evidence to show that appellant, as an addict, had a general tendency to lie, it would have confronted court decisions rejecting such evidence in the absence of a sufficiently established relationship between drug taking and veracity. *Kelly v. Maryland Cas. Co.,* 45 F.2d 782 (W.D.Va.1929), *aff'd on other grounds,* 45 F.2d 788 (4th Cir. 1930). *See People v. Williams,* 6 N.Y.2d 18, 187 N.Y.S.2d 750, 159 N.E.2d 549, *cert. denied,* 361 U.S. 920, 80 S.Ct. 266, 4 L.Ed.2d 188 (1959). *See generally* 60 Colum.L.Rev. 562 (1960).

Finally, "[o]nly after the defendant has introduced evidence of his good character may the government in rebuttal offer evidence of bad character. Such evidence is confined to that of general reputation. Consequently, specific in-

cidents in the life of the accused may not be shown, but only his reputation in the community." *Adams v. District of Columbia,* D.C.Mun. App., 134 A.2d 645, 647 (1957) (footnote omitted). Thus, it appears that Ms. Brockenbury's narcotics evidence would not have been admissible for impeachment of appellant's character. *See Michelson v. United States,* 335 U.S. 469, 475–79, 69 S.Ct. 213, 93 L.Ed. 168 (1948); *United States v. Fox,* 154 U.S.App.D.C. 1, 4–5, 473 F.2d 131, 134–35 (1972).

3. The government contends that appellant did not initially object to introduction of the narcotics evidence, and that this case as a result is subject to the "plain error" standard of review. We are satisfied that defense counsel made timely objection and that the "plain error" standard accordingly does not govern. The record shows that defense counsel asked to approach the bench immediately after the prosecutor had first elicited a response from Ms.

conviction must be reversed and the case remanded for a new trial.

*Reversed and Remanded.*

Brockenbury that she had given appellant money for narcotics. It is clear from the context that counsel was attempting to register an objection to that line of questioning, without highlighting the nature of the objection to the jury. *See United States v. Kearney,* 136 U.S. App.D.C. 328, 332, 420 F.2d 170, 174 (1969). The court refused counsel's request to confer. After several more questions about appellant's narcotics habit, including the question that led to Ms. Brockenbury's response that she had seen appellant shooting drugs into his arm with a needle, counsel objected "to this line of questioning." The court replied, "that's enough."

However, as discussed in the text, the prosecutor thereupon elicited the evidence that Ms. Brockenbury had accompanied appellant to 3600 Ely Place, where he purchased narcotics. At the end of Ms. Brockenbury's testimony, appellant's counsel moved for a mistrial based on the narcotics evidence; the motion was denied. Under these circumstances we conclude that defense counsel did all that was necessary to register appropriate objection to preserve "harmless error" review.