John Q. WESLEY, Jr., Appellant,

v.

UNITED STATES, Appellee.

Angelo BOONE, Appellant,

v.

UNITED STATES, Appellee.

Nos. 84–1704, 84–1734.

District of Columbia Court of Appeals.

Argued Dec. 7, 1987.
Decided Oct. 6, 1988.

Michael A. Olshonsky, Washington, D.C., appointed by the court, for appellant Wesley.

Jamie S. Gardner, Public Defender Service, with whom James Klein and Jennifer P. Lyman, Public Defender Service, Washington, D.C., were on the brief, for appellant Boone.

Thomas E. Booth, Atty., Dept. of Justice, with whom Joseph E. diGenova, U.S. Atty., at the time the brief was filed, and Michael W. Farrell and Mary Ellen Abrecht, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before FERREN, BELSON, and TERRY, Associate Judges.

BELSON, Associate Judge:

Appellants challenge their convictions, by a jury, of two counts of armed robbery, D.C.Code §§ 22–2901, –3202 (1981 & 1987 Supp.), arising out of an incident that occurred in an abandoned barbershop on 7th Street, N.W. Appellant Wesley contends that the trial court abused its discretion by allowing the prosecutor to cross-examine him extensively about his admitted drug dealings prior to the incident. Co-appellant Boone raises three issues on appeal. First, he maintains that the evidence was insufficient to establish that he aided and abetted Wesley in committing the offenses. Second, he asserts that the trial court abused its discretion in denying his motions for mistrial and severance after the jury heard testimony suggesting his own involvement in drug dealings, both generally and with Wesley. Finally, he contends that prosecutorial misconduct in closing argument and rebuttal warrants reversal of his convictions. Finding no error, we affirm.

## I

The evidence, considered in the light most favorable to the government, shows that on the afternoon of November 28, 1982, George Murphy, Sandra Young, his fiancee, and Gregory Mulky, a friend, decided to go to the grocery store during the half-time break in the Washington Redskins football game they were watching on television. As Murphy was driving the three of them west on P Street, N.W., he saw another friend, Leonard Hawkins, standing under a bus shelter between Marion and 7th Streets, N.W., to keep out of the rain. Murphy stopped his car and got out to talk to Hawkins. After a short conversation, the two men decided to pool their money to buy some drugs.

While they were standing there, Murphy started to pull his money out of his pocket, but Hawkins cautioned him not to display it openly in that neighborhood. He suggested that they walk across the vacant lot next to the bus stop to an abandoned barbershop, where they could count their money in private. This barbershop, which faced 7th Street, was locked and boarded up on the front. The only access into the building was through the back doorway near an alley. The door itself was no longer in place.

As Murphy and Hawkins proceeded to the barbershop, Mulky got out of the car and followed them. Mulky went inside with the others briefly, then stepped outside, but stayed near the corner of the building, approximately five feet away, with his back to the door in order to provide protection for the two men. From where he was located, Mulky could see Murphy and Hawkins inside. Murphy and Hawkins, standing just inside the doorway, started counting their money.

A few minutes later, a car drove south on 7th Street, then turned left on P Street, where it stopped not far from Murphy's car. John Wesley and Angelo Boone alighted and walked directly across the vacant lot to the back door of the barbershop. The car drove off and turned north on 6th Street. Twenty minutes earlier, Hawkins had seen Wesley, whom he knew as a drug

dealer, and Boone, whom he knew through his younger brother, standing with some others under a shelter on 7th Street just north of the barbershop.

As Wesley and Boone approached the barbershop, they exchanged greetings with Mulky outside. Boone stayed to talk with Mulky, whom he did not know, while Wesley walked into the barbershop. From his position just inside the door, Hawkins could see Boone outside standing on an embankment about ten feet away.

Once inside the barbershop, Wesley pulled a gun on Murphy and demanded, "Give it up." In response, Murphy hollered, "Hold it. What are you doing? Hold up." Murphy's shout aroused Mulky from his conversation with Boone. Realizing that he had not provided the protection he intended, Mulky turned to go inside the barbershop, but saw Wesley holding the gun on Murphy. Immediately, Mulky started back toward Murphy's car to get some help, leaving Boone standing five feet from the door.

Inside the barbershop, Murphy, reluctant to give up his money, let a $20 bill fall to the ground. As Murphy leaned over to pick it up, Wesley kicked him. Then, after Murphy handed Wesley the $68 he had, Wesley shot Murphy in the groin at close range. Next, Wesley put the gun to Hawkins' stomach and demanded his money. Without hesitation, Hawkins gave Wesley the $63 he was holding.

During the robbery of Murphy, Boone stayed near the door of the barbershop until after the shooting. He then moved to a position in an alley about 40 feet away, where he waited for Wesley to come out of the building. When Wesley emerged, he ran to where Boone was standing. The two men fled together down the alley, then turned north on Marion Street.

Later that day, Hawkins went to Boone's house to ask him about the robbery. Boone denied having been with Wesley during the robbery and denied knowing Wesley's whereabouts. As Hawkins walked away, however, he heard Wesley calling from the direction of Boone's house. Hawkins returned to talk with Wesley on the sidewalk outside the house. By that time, Boone had either gone back inside or was standing in the doorway. Wesley asked Hawkins whether he intended to testify against him. Hawkins replied that he had not yet decided.

The defense evidence consisted of Wesley's testimony on his own behalf. Wesley testified that he had gone to the barbershop not to rob Murphy and Hawkins, but to "stash" drugs that he was selling, so that no one would steal them. He admitted on direct examination that in November 1982 he was supporting himself by selling narcotics and that on the day of the incident he had been selling drugs on 7th Street. He stated, without objection, that Boone knew he was going to the barbershop to hide his drugs. Wesley claimed that when he walked into the barbershop, he had on his person drugs and $2,000 cash from drug sales. He asserted that as he entered, Murphy drew a gun on him, which discharged when he pushed it away. He then fled, still in possession of his drugs and money and unaware that Murphy had been shot.

Boone did not testify or introduce any other evidence.

## II

■ Wesley argues that the trial court erred in allowing the prosecutor to question him extensively about his drug dealings. After Wesley had testified on direct examination that he was a drug dealer and that on the day of the incident he had been so engaged, the prosecutor cross-examined him concerning the types of drugs he had sold that day; the times and places where he had been selling them; the prices he had been asking; his sources; and his sales techniques, including his use of the barbershop from time to time to hide his drugs and his employment of "runners" to bring in customers.

Wesley's counsel failed to object to most of the questions as they were asked. Once, after objecting to specific questions about Wesley's sources, his counsel objected to "this whole line of testimony," appar-

ently referring to the questions concerning sources. The court overruled this objection, although it sustained some of the specific objections concerning his sources' names and physical descriptions. After Wesley had testified about his use of the barbershop to stash his drugs, his counsel again voiced a general objection to the "whole line of inquiry," but did not move to strike, stating only that the testimony sought was irrelevant to the facts surrounding the incident and was elicited solely because "Mr. Wesley has admitted he is a drug dealer." The court responded that the questions went to Wesley's defense that he used the barbershop to stash his drugs, a fact that Wesley's counsel had brought out on direct.

"[A] defendant who takes the stand in his own behalf cannot then claim the privilege against cross-examination on matters reasonably related to the subject matter of his direct examination." *McGautha v. California,* 402 U.S. 183, 215, 91 S.Ct. 1454, 1471, 28 L.Ed.2d 711 (1971). Thus, when a defendant testifies to certain facts or issues during his direct examination, he "open[s] the door" to further inquiry into those matters on cross-examination. *Curry v. United States,* 322 A.2d 268, 269 (D.C.1974). The extent and scope of that cross-examination are subject to the broad discretion of the trial judge. *See Harling v. United States,* 382 A.2d 845, 847 (D.C. 1978) (cross-examination of a defense witness); *Coleman v. United States,* 379 A.2d 710, 712 (D.C.1977) (cross-examination of the defendant); *United States v. Raper,* 219 U.S.App.D.C. 243, 248, 676 F.2d 841, 846 (1982) (applying Rule 611(b) of the Federal Rules of Evidence to cross-examination of the defendant).

We conclude that the trial court did not abuse its discretion by allowing the prosecutor to question Wesley about his drug dealings in general or about any of the specific aspects to which he raised objections. Wesley "opened the door" to questions about his drug dealings by his testimony on direct examination that he had been selling drugs that day and that he entered the vacant barbershop to stash his drugs, not to rob Murphy and Hawkins.

Wesley suggests, however, that the prosecutor's questioning was too extensive. Although the questions covered several areas, they all related to Wesley's broad testimony on direct examination. In addition, the questions were intended to discredit Wesley's testimony by showing that his drug sales that day were in fact so poor that he had decided to rob Murphy and Hawkins to supplement his income. Thus, not only were the questions confined to the scope of Wesley's direct testimony, they also were relevant to the government's theory, which it expressed in its closing arguments. Accordingly, we find no grounds to reverse Wesley's convictions.

### III

■ We next turn to Boone's claim that the evidence against him was insufficient for conviction. Boone moved for judgment of acquittal at the close of the government's case-in-chief and again at the conclusion of all the evidence. Because Boone put on no defense, the sufficiency determination depends on whether the government's evidence in its case-in-chief could support a conviction based on aiding and abetting. *See Dumas v. United States,* 483 A.2d 301, 303 (D.C.1984).

A motion for judgment of acquittal must be granted "[i]f there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt...." *Curry v. United States,* 520 A.2d 255, 262 (D.C.1987) (quoting *Curley v. United States,* 81 U.S.App.D.C. 389, 392–93, 160 F.2d 229, 232–33, *cert. denied,* 331 U.S. 837, 67 S.Ct. 1512, 91 L.Ed. 1850 (1947)). In other words, if the evidence in the light most favorable to the government would of necessity leave the jury with a reasonable doubt as to any of the essential elements of the crime, the motion must be granted. *Id.* at 263. On the other hand, "[t]he evidence need not compel a finding of guilt beyond a reasonable doubt" for the case to go to the jury. *Id.* If "the evidence is such that a reasonable mind might or might not have a reasonable doubt as to the guilt of the accused" the motion should not be granted. *Id.* (citing *Crawford v. United States,* 126

U.S.App.D.C. 156, 158, 375 F.2d 332, 334 (1967)).

The essential elements of aiding and abetting are that a crime was committed, that the accused participated in its commission, and that he did so with guilty knowledge. *West v. United States*, 499 A.2d 860, 865 (D.C. 1985); *Murchison v. United States*, 486 A.2d 77, 81 (D.C.1984); *Byrd v. United States*, 364 A.2d 1215, 1219 (D.C. 1976). In this case, the evidence clearly shows the commission of a crime, *i.e.*, Wesley's robbery of Murphy and Hawkins at gunpoint. Thus, the sufficiency question as to Boone turns on whether Boone participated in the robbery and whether he had guilty knowledge of it.

To be convicted of aiding and abetting, a defendant must be involved in the criminal activity to the extent that he " 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.' " *Settles v. United States*, 522 A.2d 348, 357 (D.C. 1987) (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949)).

Boone's degree of participation in the robbery of Murphy and Hawkins was greater than that of the defendant in *Bailey v. United States*, 135 U.S.App.D.C. 95, 416 F.2d 1110 (1969), the case on which Boone chiefly relies. In *Bailey*, the defendant had been observed during the afternoon in the company of an unidentified man who later robbed the bookkeeper of the Center Market Provision Company of the company's daily bank deposit. From time to time that afternoon, however, the defendant had also been engaged in activities with others. Just before the robbery, the defendant and an unidentified man walked across the street to where the bookkeeper's car was parked. After the defendant had turned, walked away, and stood some ten feet away, his companion held up the bookkeeper at gunpoint. When someone yelled, "Look, they're robbing him," the two men fled in the same direction. *Id.* at 97, 416 F.2d at 1112. The United States Court of Appeals for the District of Columbia Circuit held that the government's evidence, which showed only "presence at the scene of the crime, slight prior association with the actual perpetrator, and subsequent flight," *id.* at 98, 416 F.2d at 1113, aroused no more than a suspicion of guilt, insufficient for a conviction. *Id.* at 101, 416 F.2d at 1116.

In the instant case, however, the association between Boone and Wesley was more than casual association on the street. Both men were together not only during the robbery, but at different locations throughout the day. Earlier, they were observed with others under the same shelter on 7th Street. Just before the robbery, they arrived in the same car and walked together directly to the barbershop. After they fled, both were seen in the vicinity of Boone's house.

In addition, Boone's presence was a substantial aid to Wesley. Most significantly, Boone distracted Mulky, who was acting as a lookout for Murphy and Hawkins, by conversing with him. Because of this diversion, Wesley was able to slip into the barbershop. Although Boone argues that it is unclear from the record who initiated the conversation, his point is not significant. What is significant is that Boone's ongoing conversation with Mulky enabled Wesley to enter the shop. Second, during most of the time Wesley was robbing Murphy, Boone was standing in a slightly elevated position on the embankment just ten feet away. Shortly before Wesley came out, Boone had repaired to a point in the alley. From this circumstantial evidence, one could reasonably conclude that Boone was serving as a lookout for Wesley. Furthermore, by waiting for Wesley and fleeing in tandem with him, Boone assisted Wesley's escape. Thus, there is sufficient evidence to support a finding that Boone facilitated the commission of the crime. *See Settles, supra,* 522 A.2d at 357 (presence will be "equated to aiding and abetting when it is shown that it designedly encourages the perpetrator, facilitates the unlawful deed—as when the accused acts as a lookout—or where it stimulates others to render assistance to the criminal act"), quoting *Bailey, supra,* 135 U.S.App.D.C. at

98–99, 416 F.2d at 1113–14); *Montgomery v. United States*, 384 A.2d 655, 659 (D.C. 1978) (circumstances created inference that defendant acted as a lookout, a factor supporting conclusion that he was an aider and abettor).

Finally, there is circumstantial evidence from which a jury could conclude that Boone had guilty knowledge of the crime. One could reasonably infer that, from where he continued to stand only ten feet away, Boone, like Mulky, was aware that the robbery was taking place because of what he could see for himself through the open door, the shouts inside, and Mulky's action in going to the door and then departing quickly. Unlike Mulky, however, Boone did not withdraw or disassociate himself when the criminal activity was initiated. *Cf. Settles, supra*, 522 A.2d at 358–59 (finding Settles' codefendant Whitley liable for aiding and abetting because he did nothing to disassociate himself from the criminal activity, in contrast to the defendant in *Bailey*). Instead, Boone first remained at the entrance, then moved off a short distance and waited until Wesley ran from the building, and finally fled with Wesley, thereby indicating that he tacitly approved and was connected to the crime. His later false denial that he was with Wesley or that Wesley was in the vicinity of his house also, inferably shows consciousness of guilt. *See Clark v. United States*, 418 A.2d 1059, 1061 (D.C.1980). This circumstantial evidence of Boone's intent is not necessarily refuted by Wesley's testimony that he and Boone went to the barbershop to stash illegal drugs, rather than to engage in armed robbery. The jury could reasonably infer that Boone undertook to assist Wesley in the criminal activity that unfolded just ten feet away from him after Wesley passed through the doorway.

Given the foregoing, the trial judge properly denied Boone's motion for judgment of acquittal. The evidence presented by the government, although not overwhelming, was strong enough to establish all three elements of aiding and abetting—that a crime occurred, that Boone participated in the criminal activity, and that Boone had guilty knowledge of it.

## IV

■ Twice Boone moved for a mistrial. The trial court denied both motions. The first motion was made after Hawkins had testified about his acquaintance with Boone. Hawkins, who admitted he sold and used drugs, stated that when he would meet Boone, they would exchange greetings such as " 'Bye,' 'Hi,' and 'Who has some reefer.' " Boone's counsel moved for a mistrial, arguing that Hawkins' testimony connecting Boone with drugs was impermissibly prejudicial to Boone. The trial court denied the motion, concluding that the statement amounted to nothing more than a casual remark about who had marijuana between an admitted drug dealer and an acquaintance.

The second motion followed testimony by codefendant Wesley on cross-examination by the government that Boone would get a sale for him "here and there" on the afternoon of the robbery and then was paid with a share of the proceeds or with some drugs for himself. After six questions on this topic were asked and answered without objection, counsel for Boone approached the bench and renewed her motion for a severance. In response, the prosecutor explained that the evidence was elicited to show a partnership relationship between Wesley and Boone, a working in concert, well within the *Drew* exceptions.[1] She argued that the probative value of the evidence outweighed its prejudice. The trial judge concluded that although the evidence was prejudicial, it was not so prejudicial as to require a mistrial. The trial judge admonished the prosecutor not to question Wesley further about Boone's drug dealings. At the request of Boone's counsel, he did not give a cautionary instruction at

1. Evidence of "other crimes" is not admissible to show a defendant's criminal disposition, but is admissible when relevant to and probative of motive, intent, absence of mistake or accident, common scheme or plan, or identity. *Drew v. United States*, 118 U.S. App. D.C. 11, 16, 331 F.2d 85, 90 (1964).

the time, but did give a limiting instruction at the very end of the general charge to the jury

> that those questions and answers [given by Mr. Wesley during his cross-examination which related to the sale of drugs] are to be considered by you only with respect to Mr. Wesley, and not with respect to Mr. Boone. You must not consider those questions and answers in your deliberations with respect to Mr. Boone.

On appeal, Boone argues that the trial judge abused his discretion by failing to sever his case from Wesley's and to declare a mistrial as to him. He contends not only that the evidence of his drug sales for Wesley was highly prejudicial and irrelevant, but also that the limiting instruction was insufficient to dispel the harm caused by Wesley's testimony. The government contended at trial that the evidence that Boone had been working with Wesley in selling drugs was relevant to their association at the time of the robbery and, therefore, to Boone's intent. Such evidence would be admissible as a *Drew* exception if its probative value outweighed its prejudice. *Bigelow v. United States*, 498 A.2d 210, 214 (D.C.1985); *Jones v. United States*, 477 A.2d 231, 237 (D.C.1984); *Willcher v. United States*, 408 A.2d 67, 75 (D.C.1979). Although the trial judge effectively ruled through the limiting instruction that the evidence was not admitted, this court can consider its relevance in assessing Boone's argument that a mistrial was required.

We are satisfied that Wesley's testimony that Boone had been assisting him that day in drug sales tended to establish that the association between the two men at the barbershop was more than casual and that Boone's presence at the barbershop with Wesley was not fortuitous. This testimony helped explain the significance of Wesley's earlier testimony on direct examination, given without objection, that Boone knew Wesley was going to the abandoned barbershop to stash his drugs. Boone had this knowledge because he was working with Wesley. The fact that they had been working in concert could have been considered

in determining whether Boone's intent was to further Wesley's plans, *see Downing v. United States*, 434 A.2d 409, 412 (D.C. 1981) (Ferren, J., concurring), a material issue in the case because Boone was charged on a theory of aiding and abetting Wesley. Thus, the evidence was sufficiently probative to have been admissible as a *Drew* exception, as long as the probativeness of the evidence outweighed its prejudice.

Although the trial judge may have denied admission on the basis that Wesley's statements were too prejudicial, it is clear in light of the evidence as a whole that these statements reasonably could have been deemed not unduly prejudicial to Boone. All of the witnesses for both the prosecution and defense, save the police officers, testified to their use of an assortment of illegal drugs. Hawkins and Wesley went further and testified about their distribution of illegal drugs. The jury was repeatedly told that this neighborhood was a prime market for drugs. In fact, the government witnesses were seeking to buy drugs when they were robbed. In this context, there was little danger that the jury would have been swayed to find Boone guilty merely because he was alleged to have engaged in drug transactions.

Furthermore, the testimony did not reveal anything the jury could not have surmised from other evidence to which Boone did not object. The jurors, aware that on three occasions that day Boone was seen with Wesley, who testified that he had spent the day selling drugs and that Boone was accompanying him to the barbershop to stash his drugs, could readily have inferred, without the disputed statements, that Boone was assisting Wesley in his drug dealing. Thus, the principal impact of the evidence of Boone's activities adduced from Wesley on cross-examination was not to show that Boone was cooperating with Wesley in narcotics dealing—the jury already had ample reason to conclude that he was—but rather to show how closely Boone and Wesley were associated in the

hours before the robbery.[2] Accordingly, the trial judge would not have abused his discretion if he had concluded that the evidence was more probative than prejudicial, and therefore had allowed the jury to consider it as an exception to *Drews*.[3] The closeness of this issue has an important bearing on whether a mistrial was required.

In the end, we must decide whether the trial judge abused his discretion in declining to order a mistrial under all the circumstances presented to him. The record discloses that the trial judge was acutely aware of the potential for prejudice to Boone from the evidence in question, and was cognizant of the need for a mistrial and severance if the level of prejudice became too great. This particular severance motion was made after defense counsel permitted the government to ask, without contemporaneous objection, six questions that bore upon Boone's role in Wesley's selling of drugs. The trial judge, after discussing the matter thoroughly with counsel, cut off further questions by the government in the disputed area, deferred to Boone's counsel's requests regarding a limiting instruction (not giving one at the time, but including one in his general instruction), and limited the government's closing argument in this regard, excluding even reference to some testimony to which Boone had not objected. We conclude that the trial judge did not abuse his discretion in handling the matter the way he did. This court will reverse a denial of a mistrial "only in extreme situations threatening a miscarriage of justice." *Beale v. United States*, 465 A.2d 796, 799

(D.C.1983), *cert. denied*, 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984). The situation here did not rise to that level. *See Downing v. United States, supra*, 434 A.2d 409 (cautionary instruction was sufficient to dispel any prejudice that may have resulted from witness' remark linking appellant to other crimes). Here, the trial judge, proceeding very cautiously, made full use of alternative measures to alleviate any prejudice that might have occurred.

## V

Finally, Boone seeks reversal for several alleged instances of prosecutorial misconduct during closing arguments and rebuttal. Only one of them merits discussion. Because Boone failed to object to the others at trial, we have reviewed them under the plain error standard, *see Lyons v. United States*, 514 A.2d 423, 432 (D.C.1986); *Watts v. United States*, 362 A.2d 706, 709 (D.C.1976) (en banc), which they clearly do not meet, and we will not discuss them.

An argument that Boone made in the trial court and renews on appeal is that an analogy the prosecutor drew between Boone's participation in the robbery and Bob Holley, a former backup quarterback for the Washington Redskins football team, misstated the law on aiding and abetting and suggested facts not in evidence. The prosecutor stated:

> Do you remember Bob Holley? He was a backup quarterback for the Redskins a couple of years ago. The Redskins went to the Super Bowl that year. And as you know, the Redskins won that Super Bowl. Bob Holley sat on the bench for that entire time. He didn't play a single,

2. We do not suggest, as the dissent states, that "Boone inevitably was tarnished by the admissible testimony about drug dealing that went on in the neighborhood, even if he was not shown to have been a part of it" (footnote omitted), a sort of "guilt by association." (Dissent at 1033.) Instead, we refer to evidence, admitted without objection, which established Boone's close association on that day with the drug-dealing Wesley, the drug use or drug transactions of all the actors, other than police officers, who testified about their role in the day's events and, as well, the character of the neighborhood immediately surrounding the abandoned barbershop.

3. The dissent is incorrect in stating that we are necessarily holding that the trial judge abused his discretion in declining to permit the jury to consider, with respect to Boone's guilt, Wesley's answers regarding his sale of drugs and Boone's role in those sales. (Dissent at 1033.) We hold instead that the trial judge would have acted within his discretion had he ruled the other way, and that the amount of prejudice entailed in the exposure of the jury to the testimony in question was not such as to require the court to declare a mistrial.

solitary down for that game. Joe Theisman[n] played every single day [sic], but if something happened to Theisman[n], Holley was there. He was waiting, and he could go in. Just sitting on that bench, being ready was what he was doing that day.

At this point, Boone objected that the prosecutor was misstating the law. The court observed that the argument certainly was not evidence, whether or not it was the law. The prosecutor continued:

Everything he does, just sitting there on the sidelines, is assisting that team because he is a member of the team. Everything he does is assisting that team. Even if it is just sitting on the sidelines—

Boone renewed his objection. The court explained to the jury that it would instruct it on the law of aiding and abetting later. The prosecutor went on:

Every member of that team, ladies and gentlemen, got their Super Bowl rings, all right. It wasn't just the people who played. It wasn't just the first stringers. It was the whole team, because it was a combined effort, just like here. It is a combined effort. It is a combined effort between Mr. Boone and Mr. Wesley. He was playing his part. And as Judge Alprin has said, as [Boone's attorney] has said, there is the law of aiding and abetting, and he will instruct you on the law of aiding and abetting.

There is a principal actor and a second actor in the law of aiding and abetting. And the second actor doesn't do everything the principal does. He does not have to carry the gun and point the gun and take the money. He does something in the furtherance of that crime. He does something to assist the principal. Now, there is no question, ladies and gentlemen, about what Mr. Wesley did. There is no question about what he did. He deserves his Super Bowl ring for what he did that day, just like Joe Theisman[n] did. But, ladies and gentlemen, when you go back to your jury room, don't forget about Mr. Boone. Don't forget that he was also on the team that

day, and he was ready, willing, and able to assist in that robbery, and that is what his job was. When you go back to the jury room, don't forget about his ring also.

Boone did not object to these final paragraphs of the rebuttal argument. Later, during the general charge to the jury, the trial court instructed the jury on aiding and abetting, with a specific instruction about presence at the scene and intent:

Some conduct by the defendant of an affirmative character in furtherance of a common criminal design or purpose is necessary. Mere physical presence by the defendant at the time and place of the commission of the offense is not by itself sufficient to establish his guilt. However, mere presence is enough if it is intended to and does aid a primary actor.

After the jurors had begun their deliberations, they asked for reinstruction on aiding and abetting. The court repeated the instruction given during the general charge, including the instruction on presence and intent. Twenty minutes later, the jury returned its verdict.

Boone argues that the football analogy misstated the law on aiding and abetting by implying that his mere presence outside the barbershop was sufficient to convict him without any intent to assist Wesley or evidence of his conduct in furtherance of the robbery. Boone ignores the fact that in developing her analogy, the prosecutor stressed that Holley was "assisting" the "team" as a member and was "waiting [to] go in." She emphasized the "combined effort" of the Redskins team, which she compared to the effort between Boone and Wesley, and finished with the statement that Boone was "ready, willing, and able to assist in that robbery." Thus, the analogy, although not completely parallel, included enough of the elements of aiding and abetting to avoid being misleading. *See United States v. Killian*, 541 F.2d 1156, 1162 (5th Cir.1976) ("An analogy used by the prosecutor in closing argument need not parallel the charged crime in every minute detail"); *see also United States v. Sawyer*, 143 U.S. App.D.C. 297, 299, 443 F.2d 712, 714 (1971)

("if the applicable principles are undisputed ... then a statement by counsel might well be helpful rather than confusing"). In addition, the judge twice instructed the jury that more than mere presence was required, once just before the verdict was delivered. The instructions were clear enough to dispel any notion that a conviction for aiding and abetting could be satisfied by mere presence.

Finally, Boone contends, for the first time on appeal, that the reference to the Super Bowl rings suggested that he had shared in the proceeds of the robbery, a fact not in evidence. We need not decide whether the lateness of this particular objection calls for application of the plain error standard, for a review of the prosecutor's statements about the rings makes clear that she was referring to the recognition of Holley's participation in helping the team win, not to the benefits that he would receive. To the degree that the analogy was ambiguous, however, we decline to infer that the prosecutor intended to imply that Boone had shared in the proceeds. *See Arnold v. United States*, 511 A.2d 399, 413 (D.C.1986) (citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed. 2d 431 (1974)). In sum, then, we are satisfied that the prosecutor engaged in no misconduct in her closing argument.

In view of the foregoing, the convictions of both appellants are

AFFIRMED.

FERREN, Associate Judge, concurring in part and dissenting in part:

I join in voting to affirm Wesley's convictions, but I would reverse as to Boone.

On direct examination, Wesley acknowledged that he was a drug dealer and had been selling drugs on the day of the robberies. During Wesley's cross-examination, the prosecutor elicited that, on the same day, Boone had made drug sales "here and there" for Wesley and had been paid either five dollars or "a quarter of dope" for each sale. At that point, counsel for Boone renewed an earlier motion for a mistrial and asked for a severance,[1] arguing that "other crimes" evidence of drug transactions would not be admissible against Boone in a separate trial and, therefore, that the government should not be allowed to benefit from linking Boone to Wesley's drug dealing. As the trial court indicated, drug dealing was in the case against Wesley because he had "opened it up in his direct examination." But, Boone had not done so, and the court accordingly agreed with Boone's counsel that, in a separate trial of Boone, the prosecutor's questions about Boone's drug sales for Wesley would have been irrelevant and thus inadmissible (assuming, of course, that Boone had not "opened the door" in some way).

More specifically, the court said to the prosecutor:

If the charge were a drug sale inside the barbershop, and you were contending that Boone aided and abetted that drug sale, you would be absolutely right. But, that is not what this case is about. This case is about an armed robbery.

The trial court not only found this other crimes evidence irrelevant but also, as the majority acknowledges, *ante* at 1028, declared it prejudicial.

In a sense, Mr. Boone is between a rock and a hard place at this point in that, I assume, that he is not putting witnesses on. Let's say that. So, the Government has rested its case in chief against him, and then the co-defendant decides to testify in a joint trial that Mr. Boone never wanted, and has moved several times actually in this trial before me to sever. And now it comes out, because of this series of events, is the fact, I

1. Counsel had moved for a mistrial when a complaining witness, Hawkins, testified that he had had "conversations" with "Ford," meaning Boone, saying no more than " 'Bye,' 'Hi,' 'Who has some reefer.' " It was unclear who had said what. The court denied the motion on the ground that the testimony was only a casual reference. The court also declined to give a requested instruction that "there was no allegation that my client was ever involved in the purchase, sale, of any drugs." The court told the prosecutor, however, that this was "a rather dangerous area" and that she "ought to be careful."

don't know if they are going to believe it or not, but is the fact that he was out there doing other things illegally that day. That can't help him, it seems to me. It has got to hurt him. So, it is prejudicial.

The trial court, however, "denied" the motion for a mistrial, "reserved" the motion for a severance, and "instruct[ed] the prosecutor not to pursue through the current witness, Mr. Wesley, questions concerning Mr. Boone's drug selling, if any, that day." The court also offered Boone a limiting instruction, which counsel declined because of a concern about highlighting the issue further. (Later, counsel changed her mind and asked for a limiting instruction at the time of the court's general charge to the jury.) Finally, the court stressed that the prosecutor, in closing argument to the jury, could not mention Boone's involvement with drugs, indeed not even Wesley's testimony that "Boone knew I was going to put the stash in the barbershop." The court then emphasized to the prosecutor: "You understand that I am making the ruling that I would not be making if ... these cases were being tried separately." The court meant, of course, that it had to protect Boone against irrelevant and prejudicial other crimes evidence that might otherwise be admissible against Wesley.[2]

Interestingly, in its brief the government does not argue that this "other crimes" evidence was admissible against Boone under an exception found in *Drew v. United States,* 118 U.S.App.D.C. 11, 331 F.2d 85 (1964). The only theory of admissibility the government advances—in a one-sentence footnote—is the "surrounding circumstances" exception found in *Robinson v. United States,* 486 A.2d 727, 729 (D.C.), *cert. denied,* 474 U.S. 852, 106 S.Ct. 151, 88 L.Ed. 2d 125 (1985); *Toliver v. United States,* 468 A.2d 958, 960 (D.C.1983); and *Green v. United States,* 440 A.2d 1005, 1007 (D.C. 1982). That exception is plainly inapplicable because all the drug transactions at issue except, perhaps, the reference to a stash at the barbershop, *supra* note 2, were not necessary to explain the "circumstances *immediately* surrounding the offense[s] charged." *Robinson,* 486 A.2d at 729 (emphasis in original). The government's only substantial argument, therefore, is harmless error and thus no abuse of discretion: the prejudice to Boone was insufficient to warrant reversal, given the relatively small amount of testimony implicating Boone in drug sales, coupled with the court's limiting instruction at the end of the general charge to the jury (Boone had waived an earlier limiting instruction).

I cannot agree with the government. Given the closeness of the case against Boone on aiding and abetting (the trial court called the case "borderline" and "very close"), I believe the inadmissible other crimes evidence was sufficiently prejudicial to mandate a severance and thus a mistrial as to Boone. *See, e.g., Jones v. United States,* 385 A.2d 750, 754 (D.C. 1978) (murder conviction reversed because of inadmissible evidence of narcotics use unrelated to homicide). The government clearly was trying to convince the jury that Boone had aided and abetted the armed robberies because of his close association with Wesley as a drug dealer on the afternoon they went to the barbershop. The prosecutor argued that Wesley's and Boone's drug transactions established "motive, ... intent to be there in that area."[3]

**2.** The trial court also was protecting Boone against the "stash in the barbershop" testimony that was admissible as to Boone, apparently, because counsel had failed to object and, arguably, because that testimony helped explain the circumstances immediately surrounding the barbershop robberies and assault. *See Robinson v. United States,* 486 A.2d 727, 729 (D.C.), *cert. denied,* 474 U.S. 852, 106 S.Ct. 151, 88 L.Ed.2d 125 (1985); *Toliver v. United States,* 468 A.2d 958, 960 (D.C. 1983); *Green v. United States,* 440 A.2d 1005, 1007 (D.C. 1982). If that testimony alone had been admitted, however, the jury would have learned, at most, that Boone had gone along with Wesley to the barbershop knowing Wesley was going to "stash" narcotics there, *not* that Boone himself was a drug dealer.

**3.** More specifically, the prosecutor argued to the court against Boone's motion for a mistrial and severance:

It would seem to me that we should be able to pursue the fact that Boone was with Wesley.... That they were working in concert

The trial court agreed with Boone's counsel, however, that the announced motive for going into the barbershop—to put drugs there—did not imply motive or intent to rob and therefore did not supply a basis under *Drew* for evidence about drugs. Indeed, the government now apparently agrees that no *Drew* exception applies, for it has abandoned that argument on appeal.

Nonetheless, my colleagues in the majority conclude (1) the "other crimes" evidence would have been admissible under the *Drew* exception for "intent," and (2) the evidence was more probative than prejudicial essentially because so many witnesses adverted to drug use that Boone was inevitably (and thus properly) implicated in such illicit activity of the neighborhood. I believe they are wrong in both respects.

First, in relying on admissibility of the "other crimes" evidence, my colleagues necessarily are holding that the trial court erred in ruling that evidence inadmissible—a holding that they fail to articulate and, in any event, a holding that simply will not "write." Despite acknowledging the trial court's ruling that the evidence was "too prejudicial" for admissibility, the majority suggests that the trial court "could have" ruled otherwise, *ante* at 1028, and that the jury in any event "could readily have inferred, without the disputed statements, that Boone had assisted Wesley in his drug dealing." *Ante* at 1028. I do not understand how this court, given our standard of review, can ignore what the trial judge—who heard the evidence and watched witness demeanor—*did* say about the impact of the "other crimes" evidence, and then base this court's ruling on what the jury "could readily have inferred" *if* the tainted evidence had not been there. The fact is, prejudicial evidence was there, and the majority is not willing to base affirmance on the only legitimate ground available: that no reasonable jury could

have been swayed by the tainted evidence to find appellant not guilty.

In any event, the majority is wrong on the merits of the *Drew* analysis: an intent "to further Wesley's plans," *ante* at 1028, is so obviously vague that it begs the question. In effect, the majority has to be saying that an intent to further drug dealing was an intent, under the circumstances, to engage in armed robbery. As the trial court, and now the government, have recognized, however, that analysis will not work. There was absolutely no evidentiary predicate linking Boone's occasional drug sales with the robberies; there was only evidence of appellants' fortuitously confronting the complainants at a place where Wesley had decided to stash narcotics.

Second, as to prejudice, the majority does not say, as the government argues, that the prejudice is insufficient for reversal assuming the other crimes evidence was improperly before the jury. The only basis on which my colleagues find the evidence more probative than prejudicial is astonishing. They say, in effect, that Boone inevitably was tarnished by the admissible testimony about drug dealing that went on in the neighborhood, even if he was not shown to have been a part of it.[4] That kind of guilt by association is irrelevant and has no place here, to say the least. The fact that other crimes evidence would make Boone look no worse than others in the neighborhood does not mean such evidence would make him look no worse than he would without that evidence.

Accordingly, I respectfully dissent as to Boone. I would reverse and remand for a new trial because the trial court abused its discretion in failing to grant Boone's requested severance.

that afternoon. It would seem to me, because then they go to the barbershop, and our argument, of course, is they continue to work in concert. And the fact that it deals with drugs, it seems to me, is somewhat prejudicial. But, those are the facts. And the probative value of that association far outweighs the prejudice. It is highly probative to Boone's motive

for being with Wesley. It is highly probative to their association of that afternoon.

4. The two unchallenged or unchallengeable references to Boone's connection with drugs did not meaningfully implicate him. *See supra* notes 1 and 2.