No. 98,498

STATE OF KANSAS, *Appellee*, v. CARL LEE BAKER, *Appellant*.

(197 P.3d 421)

Opinion filed December 5, 2008.

*Lydia Krebs*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Robert D. Hecht*, district attorney, argued the cause, and *Jamie L. Karasek*, assistant district attorney, and *Stephen N. Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: Carl Lee Baker was convicted of felony murder and kidnapping and received consecutive sentences of life without the possibility of parole for 20 years (hard 20) for the murder and 233 months in prison for the kidnapping. He now appeals his convictions and sentences. Our jurisdiction is under K.S.A. 22-3601(b) (conviction of an off-grid crime).

The issues on appeal, and our accompanying holdings, are as follows:

1. Did the trial court err in refusing Baker's request to instruct on compulsion? No.

2. Did the trial court abuse its discretion in admitting three postmortem photographs of the victim's body? No.

3. Did the prosecutor commit reversible misconduct when using a sports team analogy to explain the concept of aiding and abetting to the jury? No.

4. Did the trial court erroneously impose an enhanced sentence based upon prior criminal history without requiring those crimes be proved beyond a reasonable doubt? No.

Accordingly, we affirm Baker's convictions and sentences.

## FACTS

In July 2006, defendant Baker and three others were arrested and charged with the kidnapping and felony murder of David Owen. Baker gave a videotaped oral statement and a written statement to police. He also participated in a videotaped reenactment of the events leading to Owen's death. Information from those communications, as well as the trial testimony and written statement of accomplice John Cornell, provided virtually all of the following facts to the jury. The facts are best understood when presented by stages.

### Stage One

Baker had been living in a "hobo camp" in the woods near the Topeka Rescue Mission. Other homeless people living in the camp included Cornell, Charles Hollingsworth, and Hollingsworth's girlfriend, Kim Sharp. The others would leave the camp to eat at the Rescue Mission several times a day, to panhandle, and to do other things. Baker never left the camp, however, because according to him, contact with the police would mean they would "put me right back in the penitentiary" due to an outstanding arrest warrant. As the interviewing officer confirmed with Baker, "[E]verybody was looking for you"—"you're warranted." Cornell confirmed that Baker "was running from the police."

Late one afternoon in mid-June 2006, after Baker had been living in the camp for 4-6 days, he and the others were conversing when Owen interrupted. Owen was a self-appointed homeless advocate who, in efforts to break their homelessness cycle, disrupted or damaged such camps and insisted that the inhabitants call their

families. He offered the inhabitants the use of his cell phone and phone cards.

All the camp inhabitants that day rejected Owen's offers and became irritated because he would not leave. Baker told him to "just get the hell out of the camp" and "get the fuck out of here." An argument soon erupted between Owen, Baker, and Hollingsworth in which they got within 6 inches of each other's faces. Owen threatened to call the police and reached into the briefcase he was carrying. According to Baker, he did not want the police called because of his outstanding warrant. Hollingsworth grabbed Owen's arm and knocked a cell phone out of his hand. Hollingsworth then grabbed the briefcase from Owen and tossed it on the ground.

After grabbing the briefcase, Hollingsworth slammed Owen to the ground and hit him. Hollingsworth then picked Owen up and forced him onto a bench. Sharp picked up Owen's phone and briefcase and began going through its contents. She found photographs taken by him which showed the damage he had inflicted in other homeless camps. Enraged by the photographs, Sharp began throwing the contents of the briefcase, including Owen's cell phones, papers, and photographs, and eventually the briefcase itself, into an incinerator in the camp. Owen protested while she destroyed his belongings.

Ron Greene, another homeless person, entered the camp at this time, looking for another inhabitant, Mark Brown. Hollingsworth did not know Greene and asked the others who Greene was. Cornell replied that he was "an all right guy," and Sharp vouched for him as well.

## Stage Two

Hollingsworth grabbed Owen by the arm and lifted him from the bench. Hollingsworth then led Owen out of the camp, grabbing an axe out of a tree as he left. Sharp later followed Hollingsworth and Owen to a spot in the woods 30-40 yards away that was not visible from the camp. Baker, Cornell, and Greene remained in the camp.

Hollingsworth eventually yelled back in the direction of the camp for a rope. Baker retrieved a rope and a machete from his tent and, with machete in hand, gave the rope to Cornell. Baker instructed him to take it to Hollingsworth.

Cornell took the rope to Hollingsworth where he saw Owen on his knees with Hollingsworth standing over him, axe in hand. Sharp told Cornell not to worry. They were not going to kill Owen, she said, but were "just going to tie him up and make him sleep out with the mosquitos and snakes" so he would know what it was like for homeless people when he had damaged one of their camps. Cornell returned to the camp, rejoining Baker and Greene. In the meantime, Baker had thrust the machete through his belt.

## Stage Three

According to Baker's brief, 10 minutes later Hollingsworth led Owen back to the camp, accompanied by Sharp. Owen's hands were tied behind his back; the rope was tied around one wrist, then wrapped up around the front of his neck and down to the other wrist. A rag had been stuffed in his mouth.

After sitting Owen back on the bench, Hollingsworth placed the axe on the table. Immediately upon seeing this, Greene said, "[W]ell, tell Mark [Brown] I'll be back later," and left the camp. Hollingsworth and Baker then took several minutes to roll themselves cigarettes. According to Baker's statement, when the rolling was completed Hollingsworth said that they needed to "take him over and get rid of this bastard 'cause he had to die.'" Also according to Baker's statement, Hollingsworth told him that he had to "help him drag him [Owen] down to the river." Hollingsworth lifted Owen from the bench and began to lead him out of the camp. Hollingsworth did not pick up the axe. Baker's machete remained thrust through his belt, and Sharp and Cornell remained in the camp.

## Stage Four

According to Baker's statement, Owen was able to walk but dragged his feet and did not fully cooperate. Baker and Hollingsworth each held an arm and, half-carrying and half-leading, took

him, bound and gagged, over the dike and toward the river. While they descended the dike, Owen sat down and refused to walk. Hollingsworth then struck Owen and dragged him by his feet down the rocks. After reaching the bottom, Hollingsworth forced Owen up, and the three men continued across the open area to the railroad bridge.

According to Baker, he and Hollingsworth eventually led Owen into the woods by the river near the railroad bridge. There, while Baker watched, Hollingsworth tied Owen to a tree. He anchored Owen's head to the tree with a rope around his neck and then connected the rope to Owen's feet. If Owen lowered his feet, the neck rope would tighten and choke him. While Baker watched, Hollingsworth then twice kicked Owen in the head with his steel-toed boot, rendering him unconscious. Baker and Hollingsworth then walked back to the camp. According to Cornell, they were gone about 10-15 minutes.

### Stage Five

Upon Baker's and Hollingsworth's return, rejoining Sharp and Cornell, Sharp asked Hollingsworth about Owen. Hollingsworth responded, "[H]e's probably dead by now . . . because when we left, he was turning blue." Hollingsworth, Cornell, Sharp, and Baker all remained in the camp that night and did not go to the nearby Rescue Mission for dinner. Later in the evening, Cornell and Baker left the camp to look for firewood. Baker told Cornell that "Charles [Hollingsworth] lynched [Owen]."

### Stage Six

The next day, everyone went to the Rescue Mission to eat except for Baker, again because of his outstanding arrest warrant. According to Baker's reenactment, that afternoon he and Hollingsworth returned to where they had left Owen. He was dead. Hollingsworth told Baker they had to move Owen to a place where no one would find him. They then dragged his body closer to the river. There, they removed Owen's shoes, socks, and eyeglasses. They also recovered pieces of the rope that Hollingsworth had used to tie him

up. Baker and Hollingsworth took these items back to the camp where they were burned.

## Stage Seven

A few days later, Baker, Hollingsworth, and Sharp moved to another camp. Cornell also moved to a different location.

## Stage Eight

Following up on Owen's parents' missing person complaint, police found his body approximately 2 weeks later. Baker was arrested approximately 2 weeks after that at another homeless camp. He was eventually tried on charges of felony murder and kidnapping. After his convictions, he was sentenced to life in prison without the possibility of parole for 20 years for felony murder and 233 months in prison for the kidnapping conviction, with the sentences to run consecutively.

Additional facts will be provided as necessary to the analysis.

## ANALYSIS

Issue 1: *The trial court did not err in refusing to instruct on compulsion.*

Baker argues that the trial court erred when it refused to give a jury instruction on compulsion in violation of his absolute right to present his theory of defense, citing *State v. Irons*, 250 Kan. 302, 309, 827 P.2d 722 (1992). The State counters that the court was not required to give the instruction because insufficient evidence was presented to support it. See *State v. Myers*, 233 Kan. 611, 616, 664 P.2d 834 (1983).

We articulated our standard of review in *State v. Oliver*, 280 Kan. 681, 706, 124 P.3d 493 (2005):

" 'The district court 'must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence.' *State v. Williams*, 277 Kan. 338, 356, 85 P.3d 697 (2004). 'A defendant is entitled to an instruction on his or her theory of the case even though the evidence thereon is slight and supported only by the defendant's own testimony. [Citation omitted.]' *State v. Bell*, 276 Kan. 785, 792, 80 P.3d 367 (2003). Further . . . this court reviews the evidence in the light most favorable to the party requesting the instruction when

considering the district court's refusal to give a requested instruction. *Williams,* 277 Kan. at 356."

We clarified this basic standard in *State v. Anderson,* 287 Kan. 325, 334, 197 P.3d 409 (2008) to provide that the evidence, although viewed in the light most favorable to the defendant, must also be sufficient to justify a rational factfinder finding in accordance with his or her theory.

The legislature has addressed the defense of compulsion in K.S.A. 21-3209, which states:

"(1) A person is not guilty of a crime other than murder or voluntary manslaughter by reason of conduct which he performs under the compulsion or threat of the imminent infliction of death or great bodily harm, if he reasonably believes that death or great bodily harm will be inflicted upon him or upon his spouse, parent, child, brother or sister if he does not perform such conduct.

"(2) The defense provided by this section is not available to one who willfully or wantonly places himself in a situation in which it is probable that he will be subjected to compulsion or threat."

PIK Crim. 3d 54.13 echoes the statute.

In this court's interpretation of compulsion, however, it has expanded the statutory factors and has repeatedly held that

"to constitute the defense of compulsion, *coercion or duress must be present, imminent, impending, and continuous.* It must be of such a nature as to induce a well-grounded apprehension of death or serious bodily injury to oneself or one's family if the act is not done. *The doctrine of compulsion cannot be invoked as an excuse by one who had a reasonable opportunity to escape the compulsion or avoid doing the act without undue exposure to death or serious bodily harm.* A threat of future injury is not enough. [Citations omitted.]" (Emphasis added.) *State v. Matson,* 260 Kan. 366, 385, 921 P.2d 790 (1996).

Baker contends there is "sufficient evidence" indicating that he (1) acted under compulsion, *e.g.,* a threat of imminent death or serious bodily harm, and (2) had no reasonable opportunity to escape. He argues that both are therefore jury questions. Baker further asserts that the trial judge agreed he was under compulsion when the judge stated during the instruction conference, "I think it's a fair inference that having witnessed Mr. Hollingsworth's treatment of Owen instilled a reasonable fear of bodily harm in Mr. Baker."

As for more evidence of compulsion and a lack of reasonable opportunity to escape, Baker argues that Hollingsworth was younger and bigger than Baker. According to Detective Michael Barron, Hollingsworth was 18 years old, 6'2" tall, approximately 230 pounds, and of athletic build, while Baker, who had just turned 60, was 6'1" and weighed 195 pounds. Baker additionally argues that Hollingsworth ordered him to assist Hollingsworth in dragging Owen to the river and that Baker did this out of fear. Baker relies upon Cornell's testimony that Hollingsworth walked around camp with an axe or knife "all the time" and that it "would have been stupid verging on suicidal" to try to leave the camp. Baker also points to Cornell's testimony that he was afraid to leave the camp because he had been a witness to Owen's abduction and that "anyone who talked would get it." Baker himself told the police Hollingsworth threatened that he, Cornell, and Sharp "would be next" if they told anyone, and that Hollingsworth had "a hell of a temper."

The State responds with a multitude of reasons as to why the trial court was correct in denying the instruction request. It argues that (1) Baker was not compelled by any threat to him from Hollingsworth; (2) even if Hollingsworth actually threatened Baker that if he told anyone, "he would be next," the threat was made after the kidnapping and death and was a threat regarding future injury which could not qualify as imminent; (3) any coercion or duress was not continuous or imminent because Baker, Greene, and Cornell—and later just Baker and Greene—were alone in the camp at one time and Baker operated independent of Hollingsworth; (4) even if, as the trial court suggested, Baker experienced a well-grounded apprehension of death or bodily injury from witnessing Hollingsworth's treatment of Owen, he made no attempt to escape or withdraw when presented with the opportunity. Baker chose instead to remain in camp and to eventually assist Hollingsworth in moving Owen from the camp to the river.

We begin our analysis of these numerous arguments with what appeared to be the trial court's primary reason for denial of the instruction: Baker had a reasonable opportunity for escape or withdrawal. As mentioned, the doctrine of compulsion cannot be in-

voked by one who had a reasonable opportunity to escape or avoid the criminal act without undue exposure to death or serious bodily harm. *State v. Jackson*, 280 Kan. 16, 28, 118 P.3d 1238 (2005), *cert. denied* 546 U.S. 1184 (2006); *Myers*, 233 Kan. at 615 (opportunity to escape or withdraw from the criminal activity). According to Baker's counsel at oral arguments, Baker relies principally upon *State v. Hunter*, 241 Kan. 629, 740 P.2d 559 (1987), to deny he had such an opportunity. The State relies principally upon *Myers*, 233 Kan. 611. Our inquiry on whether sufficient evidence exists to warrant the instruction (see *Anderson*, 287 Kan. at 330-36) is obviously fact-sensitive, requiring a detailed review of those cases and comparing their levels of evidence to that of the instant case.

In *Hunter*, the defendant was convicted, among other things, of two counts of felony murder and aggravated kidnapping for his participation with three others in a western Kansas criminal venture. He argued on appeal that the trial court erred in refusing his requested instruction on his compulsion defense. This court agreed, reversing and remanding for a new trial.

Hunter was a hitchhiker picked up in Wichita by Daniel Remeta, Remeta's girlfriend Lisa Dunn, and Mark Walters. On the way north to Salina, Remeta fired a .22 caliber handgun out of the car window. At Salina, when Hunter asked to be let out of the car, Remeta refused. He talked about a hitchhiker he wished he had killed; took out two .357 Magnum bullets and asked Hunter if he thought they could kill Hunter; then told Hunter he had shot a girl five times with one of the weapons. Later, Remeta fired the .22 in Hunter's direction and told Hunter he had killed a man for $40 and had killed 12 other people.

On the group's continued trip west of Salina, an undersheriff was shot after he stopped their car. Although the officer testified that Hunter was the shooter, the car occupants identified Remeta instead. They also testified that Hunter then tried to shoot Remeta with the .22 but he accidentally shot Dunn.

The issue of a reasonable opportunity to escape was limited to the group's later stop at a grain elevator in Levant. From there, eventually two of the elevator's eight occupants—Schroeder and Moore—were kidnapped, placed in Moore's pickup stolen from

the elevator, and driven to a location near Colby. There they were executed by Remeta.

Much of the testimony regarding the elevator escape opportunity came from Hunter and Remeta. State's witnesses testified Hunter had a weapon and played an active role in the kidnapping and pickup theft. However, Hunter testified that he had no weapon there. Remeta confirmed that he himself had both handguns—the .22 and the .357 Magnum—at all times. Apparently after the eight occupants were rounded up and restrained, Remeta ordered Hunter to go to the other end of the elevator building to see if anyone tried to exit through the back door. Hunter testified that he walked around to the back of the building and stopped there to wait to see what happened, and Remeta then ordered him around to the other side and into the pickup. He testified that he never felt he had a chance to escape. Remeta testified that he asked Hunter to watch Schroeder and Moore at the pickup and that he would have shot Hunter if he had not followed orders.

In holding the trial court erred, the *Hunter* court held:

"The only opportunity Hunter would have had for escape would have been when he was out of sight of Remeta at the point when he went around the north side of the building at the Levant elevator. Hunter testified that Remeta came around the building and ordered him to return to the pickup. There was testimony that the total time which elapsed at the grain elevator was approximately five minutes. From the record, it is impossible to tell how long Hunter remained out of sight of Remeta. Viewed in the light most favorable to Hunter, however, and particularly in light of the fact that it was undisputed that Remeta had possession of the .357 Magnum at all times, it cannot be said that Hunter had a reasonable opportunity to escape." 241 Kan. at 645.

As in *Hunter*, the *Myers* defendant was convicted, among other things, of felony murder and kidnapping. In contrast to *Hunter*, however, in *Myers*, 233 Kan. 611, this court upheld the trial court's refusal to instruct on compulsion and affirmed the convictions. It held that Myers had numerous opportunities to escape or withdraw from the criminal activity, including a time when he was merely in a separate room of the apartment from the alleged compulsion of his accomplice. 233 Kan. at 615-16.

Myers and his accomplice Axvig unexpectedly appeared in the Manhattan apartment of two young women at 2 a.m. Myers had been there earlier in the evening to pick up 15 pounds of marijuana from one of the women, Cristel Watson. After Cristel awoke in her bed, Myers pointed a handgun at her head, instructing her to call the marijuana-delivering boyfriend to tell him Myers did not want the drugs. The other woman, Cristel's sister Elke McGuyton, came out of her bedroom to go to the bathroom and found Axvig standing in the hallway. She then darted into the bathroom.

Myers then brought Cristel out of her bedroom where they saw Axvig. Myers stated that both women would have to leave the apartment. Cristel went into Elke's bedroom and got some clothing for her sister. While there she saw Axvig pointing a handgun at Elke's boyfriend, Kevin Kitchens, who was stretched out on Elke's bed. Cristel took the clothing to Elke, who got dressed. Both women then came out of the bathroom. When Elke went into her bedroom to get her shoes, she saw Axvig still pointing his gun at Kitchens.

Myers then took both women out of the apartment, holding Elke with his left hand and his gun with the other. Axvig remained in the apartment. Once outside, Cristel escaped. After Axvig fatally shot Kitchens in the bedroom, Axvig then came to the car where Myers and Elke were now seated. He got in, and Myers drove away.

In upholding the trial court, the *Myers* court observed that several of Myers' numerous opportunities to escape or withdraw from the criminal enterprise occurred after he drove away. However, we may legitimately limit our review to the possible ones mentioned above, because as a matter of law only one reasonable opportunity is needed to bar the giving of the compulsion instruction. In our review, we also agree with the *Myers* court's apparent acknowledgment that coercion which is not "present, imminent, . . . impending[, and] continuous" can often overlap with a "reasonable opportunity to escape" or withdraw. 233 Kan. at 616. That court first summarized the evidence:

"In the case at hand, the evidence with regard to Myers' opportunity to escape, to withdraw from the criminal activity, or to alert others and seek help, is abundant. Myers was alone with Cristel in her bedroom, and he made no effort to

communicate to her, or to others over her telephone, that he was under compulsion from Axvig. To the contrary, he told Cristel in substance that this was a 'rip off,' and that he had his family waiting to leave town with the money he would make from the fifteen pounds of marijuana. *At a later point, he was alone with Cristel and Elke in the living room of the apartment, near the front door, while Axvig was in the bedroom with Kitchens; Myers made no effort to leave at that time, or to permit the two women to escape.* Again, when he took the two women outside, leaving Axvig in the apartment, Myers took Elke to the car, put her in it, and instead of speeding off to make his escape, he drove slowly, stopped, and waited to pick up Axvig." (Emphasis added.) 233 Kan. at 615.

The *Myers* court then drew several conclusions from the evidence it had recited:

"Compulsion, to constitute a defense under K.S.A. 21-3209, must be present, imminent, and impending; it must be continuous; there must be no reasonable opportunity to escape the compulsion without committing the crime. Here, under the proffered evidence [that Axvig had unloaded Myers' handgun before entering the apartment and had threatened Myers' family with harm if Myers did not cooperate], the compulsion was imminent when Myers entered the apartment; *thereafter, when Myers was out of the sight and presence of Axvig, it was not imminent. The compulsion was not continuous; Myers and Axvig went their separate ways and operated independently; the compulsion was interrupted time after time. Finally, Myers had abundant opportunities to make his escape, and failed to do so. Myers could have freed the women before or at the time they left the apartment, and he could have made his escape before the murder was committed.*" (Emphasis added.) 233 Kan. at 616.

We believe that the facts in the instant case are sufficiently like those in *Myers* to support the trial court's refusal, as in *Myers*, to instruct on compulsion. We agree with Baker that the evidence must be viewed in the light most favorable to him. But the evidence also must be sufficient to justify a rational factfinder finding in accordance with his theory of compulsion. See *Anderson,* 287 Kan. at 335-38. Under this standard, we therefore must agree with the State that there is at least one occasion of the many that it argues where the alleged coercion or duress was noncontinuous and nonimminent. As in *Myers,* that overlaps with Baker's reasonable opportunity to escape or withdraw from the criminal activity.

The State first points to Baker's opportunity to escape or withdraw when Hollingsworth dragged Owen from the camp, followed by Sharp, to a spot in the woods 30-40 yards away. Baker, Cornell,

and Greene remained in the camp. According to the uncontroverted testimony of Cornell, they could not see Hollingsworth from the camp. There is no evidence that Hollingsworth could see them.

It is also uncontroverted that during Cornell's delivery of the rope to Hollingsworth, Baker was continuously armed with a machete and was alone in the camp with only the unarmed Greene. By all accounts, the unarmed Cornell returned to the camp and rejoined them. It is further uncontroverted that not until 10 minutes later did Hollingsworth return to the camp with Owen, which meant that Baker had had an even larger window of opportunity in which to leave. Moreover, it is also uncontroverted that Hollingsworth was angry with Owen during this entire time and obviously preoccupied, particularly while he bound and gagged him. By all accounts, the Rescue Mission was close enough that the camp inhabitants could walk there to receive daily meals.

The State next points out that Baker certainly had the opportunity, like Greene, to escape when Hollingsworth had returned to the camp. It highlights the uncontroverted fact that once Greene saw Hollingsworth put down his axe, Greene immediately left. We independently observe that Greene did not slip away unnoticed; he essentially told everyone that he was leaving when he asked them to tell Brown he would be back later. It is uncontroverted that Hollingsworth made no attempt to stop the unarmed Greene from leaving. It is also uncontroverted that Baker, although still armed with the machete that he would carry continuously until after Owen was dead, made no attempt to leave.

Baker tries to dilute both these escape opportunities—when Hollingsworth was away from the camp and later when Greene left—with Cornell's testimony that it "would have been stupid verging on suicidal" if he had tried to leave the camp. A review of Cornell's testimony indicates that he failed to leave simultaneously with Greene only because he did not yet know if Hollingsworth and Baker were planning on killing Owen. If they were, trying to leave would have been too dangerous:

"Q. After Charles [Hollingsworth] returned with David [Owen] and with Kim [Sharp] . . . , Ron Greene was still present?
"A. Yes.

. . . .

"Q. Can you give us an idea of the time frame between when Charles sets down the axe and Ron Greene leaving?

"A. Almost immediately as soon as he seen him set down the axe.

"Q. Were you thinking about leaving at that time?

"A. Yeah, but I wouldn't have left with Ron even at that moment, I'm not crazy. I mean, that would have been—that would have been stupid verging on suicidal *if* they were still planning on killing David [Owen] because *if* they were planning on killing David, Ron wasn't going to make it out of there. Anybody with any brains wouldn't let him go." (Emphasis added.)

But once Cornell saw that Greene was allowed to leave the camp without any problem, he determined that Hollingsworth and Baker were not going to kill Owen. He concluded he too probably could have left then without any problem:

"Q. Now, you testified earlier that you were scared to leave?

"A. At what point?

"Q. Later on, later on after —

"A. *After* I found out that they *killed* him, yeah. I could have—when they first left the camp, *after they let Ron Greene go unmolested, I didn't think that they were going to kill David anymore. I probably could have left then.*" (Emphasis added.)

Baker's argument is initially attractive. Because Cornell's testimony could be construed to suggest that he never felt safe in leaving camp until after Greene left, it would have been unsafe for him to have left even while Hollingsworth was outside the camp with Owen. It can therefore be argued that Baker similarly could have felt unsafe in leaving the camp then also.

The problem with Baker's argument is contained in Cornell's testimony set forth above. Specifically, Cornell chose not to leave because he was afraid of "them"—both Hollingsworth and Baker—and of the possibility that they would act in concert. And during this particular time, the unarmed Cornell was always in the presence of one armed man or the other, and often both. For example, Cornell further testified that he did not leave when Hollingsworth was gone with Owen because he simply did not know if Owen was dead: "[I]f I had tried to leave then and David [Owen] was dead and he [Hollingsworth] had an axe and the other dude [Baker] had a machete, would you have left?"

Continuing on that theme, Cornell further testified that he would not have chanced leaving at that point because "[i]f him [Baker] and Charles [Hollingsworth] decided to do something, there would have been no way I could have done nothing." Similarly, in explaining why he delivered the rope as instructed by Baker, he testified that "to be honest with you, a guy [Baker] with a machete tells you to take a rope to a guy [Hollingsworth] with an axe, it's probably a good idea to take him the rope." Accordingly, the coercion or duress—by Hollingsworth, Baker, or both—was present, imminent, impending, and continuous for the unarmed Cornell. See *Matson*, 260 Kan. at 385.

By contrast, nothing prevented Baker from leaving the camp when he was out of Hollingsworth's sight for at least 10 minutes while Hollingsworth was preoccupied with Owen. At that time, Baker was alone with Greene, or Greene and Cornell. There is absolutely no evidence in the record, much less any argument made, that the armed Baker was afraid of either one of these unarmed men. Similar to the defendant in *Myers*, Baker was armed, in the presence of two unarmed people, and temporarily out of the sight and presence of the nearby armed accomplice who was preoccupied with the eventual murder victim. The *Myers* court upheld the refusal to instruct even under our former, lower standard of "any competent evidence"—construed in the light most favorable to defendant—in support of his compulsion theory. 233 Kan. at 616.

Moreover, uncontroverted evidence establishes that Baker never left the camp because he was enormously concerned about being found by law enforcement, arrested on an earlier outstanding warrant and, in his own words, being immediately put "right back in the penitentiary." By his own admission, the warrant was the specific reason he had not wanted Owen to call the police from the camp. Also by his own admission, both in the days before and after Owen's death, he never left the camp even when Hollingsworth and all the others were gone for hours. See *Anderson*, slip op. at 17, and *Myers*, 233 Kan. at 615 (evidence of defendant's conduct after the crime can be considered in the compulsion calculus, including reasonable opportunity to escape). By his own further ad-

mission, while Hollingsworth, Sharp, and Cornell all ate at the Rescue Mission the day after Owen's death, Baker not only chose to stay in the camp, but also upon their return he resumed his participation in the crimes. He helped Hollingsworth move Owen's body to avoid detection and helped partially strip the body of some identifying items and destroy them.

All of this evidence greatly undercuts Baker's argument that he never had a reasonable opportunity to escape Hollingsworth's compulsion. We cannot say it is certain that the reason Baker did not leave the camp during his 10-plus minutes while Hollingsworth was preoccupied with Owen is the same reason he *never* left the camp for days on end. We can say, however, that the evidence is insufficient to justify a rational factfinder finding in accordance with Baker's theory that he did not escape from Hollingsworth's compulsion during that period because he had no reasonable opportunity to do so.

We do agree with Baker, however, that Cornell's testimony that it would have been "stupid verging on suicidal" to have left simultaneously with Greene is sufficient to eliminate that particular time as an opportunity for Baker to escape or withdraw.

Baker argues he could not have escaped because Hollingsworth was younger and larger than he, specifically alleging that the only opportunity to escape would have involved a footrace that he was sure to lose. However, even assuming there was sufficient evidence to support Baker's argument, his assertion overlooks the fact that one need not physically escape from the criminal activity—one must merely withdraw from it or avoid doing it. See *State v. Matson*, 260 Kan. 366, 385, 921 P.2d 790 (1996) (opportunity to escape the compulsion or avoid doing the act); *State v. Myers*, 233 Kan. 611, 615, 664 P.2d 834 (1983) (opportunity to escape or withdraw from the criminal activity). Accordingly, escaping to the safety of the Rescue Mission is not required—only reaching a point where one could be said to be safely withdrawing from the criminal activity. Here, the crimes occurred in woods late one July afternoon, near an area by the river so overgrown that Hollingsworth and Baker chose it to move Owen's body to for avoiding detection. The

evidence that Baker could not have safely withdrawn is simply insufficient to justify a rational factfinder finding for him.

Baker also points to Cornell's testimony that Cornell was afraid to leave the camp because he had been a witness and Hollingsworth had told him that "anyone who talked would get it." Baker emphasizes that he himself told the police that Hollingsworth threatened Baker, Cornell, and Sharp that they "would be next" if they told anyone.

However, it is uncontroverted that Hollingsworth's statement was made after the felony kidnapping and eventual death of Owen had already occurred at the river and Hollingsworth had returned to the camp. The threat of injury or death referred only to any possible post-kidnapping activity where Baker might inform anyone else. Moreover, the threat of future injury is not sufficient to support a compulsion defense. See *Matson*, 260 Kan. at 385.

In sum, even when viewed in the light most favorable to Baker, the evidence is insufficient to justify a rational factfinder finding in accordance with his compulsion defense. See *Anderson*, 287 Kan. at 336-38. Any coercion or duress was not imminent or continuous when Hollingsworth and Owen were outside the camp. Moreover, Baker had reasonable opportunity to escape, or at least withdraw, from the criminal activities, particularly when alone in camp with Greene. See *Myers*, 233 Kan. at 616 (evidence would not, as a matter of law, have established the defense of compulsion under K.S.A. 21-3209: defendant had reasonable opportunity to escape); *cf. State v. Oliver*, 280 Kan. 681, 707, 124 P.3d 493 (2005) (murder defendant argued he was entitled to compulsion instruction because he was afraid his life would be in danger if he did not comply with colleague's directions; court held: "Although there was some minimal evidence that Oliver was under the influence of [his colleague], there was no evidence supporting the *degree* of compulsion necessary to merit an instruction on that defense." [Emphasis added.]).

Issue 2: *The trial court did not abuse its discretion by admitting three postmortem photographs.*

Baker next argues the trial court erred in denying his motion in limine and in overruling his related objection at trial to the admis-

sion of three postmortem photographs of Owen. He contends that the photographs had no relevance in explaining the manner or cause of death and that photographs of the body in that state of decomposition were unduly prejudicial. The State responds that they were relevant to the cause of death and to corroborating other witness testimony, as well as to an admission by Baker. It also argues the photographs are not unduly prejudicial.

In our review, we first determine whether the photographs are relevant. That determination—here, relevancy's probative prong because the cause of death is obviously material in a homicide case—is reviewed for abuse of discretion. *State v. Reid*, 286 Kan. 494, Syl. ¶ 1, 186 P.3d 713 (2008). Relevant evidence is evidence having any tendency in reason to prove any material fact. K.S.A. 60-401(b). All relevant evidence is admissible unless it is otherwise precluded by statute, constitutional provision, or court decision. *Reid*, 286 Kan. 494, Syl. ¶ 1.

If the evidence is relevant, we next determine whether its admission was nevertheless improper because, as alleged here, its admission was unduly prejudicial. See *State v. Sappington*, 285 Kan. 176, 195, 169 P.3d 1107 (2007). This particular review also looks for an abuse of discretion. See *State v. Torres*, 280 Kan. 309, 327, 121 P.3d 429 (2005).

All three photographs were taken near the river. The first shows Owen's body as it was found. The other two are of his feet. All three photographs disclose that the body was in a state of mild to moderate decomposition and had undergone mummification.

The photographs were first referenced during Detective Barron's testimony to demonstrate the position in which Owen's body was found, his bare feet, and the turned-out pants pocket. The State argues the photographs also corroborate the story Baker told to Barron.

The photographs were also referenced in the testimony of the coroner, Dr. Donald Pojman. He testified that the condition of the body prevented detection of any injury from blunt force trauma to the head. It also prevented him from identifying any ligature marks on Owen's neck, *i.e.*, a "dried brown skin furrow." Because of the level of decomposition and the mummification process, he found

that the exact cause of death was not ascertainable but was consistent with asphyxial death.

Accordingly, the State argues that the photographs also helped explain why Dr. Pojman's examination produced little evidence; helped explain how the decomposition of the body limited the discovery of any trauma that may have occurred prior to death; helped illustrate the difficulty in determining the cause of death; and assisted the jury's understanding of medical testimony.

We agree with the State that the photographs were relevant to the coroner's testimony. Generally, " ' "[p]hotographs which are relevant and material in assisting the jury's understanding of medical testimony are admissible. Specifically, photographs which aid a pathologist in explaining the cause of death are admissible." ' " *State v. Hernandez*, 284 Kan. 74, 99, 159 P.3d 950 (2007) (quoting *State v. Cavaness*, 278 Kan. 469, 477, 101 P.3d 717 [2004]).

While photographs are generally admitted to aid a pathologist in explaining the cause of death, another possible reason for admitting them is to show that the medical examiner has ruled out possible causes of death and the manner in which he or she has done so. In *State v. Deal*, 271 Kan. 483, 493-94, 23 P.3d 840 (2001), *abrogated on other grounds by State v. Anthony*, 282 Kan. 201, 214, 145 P.3d 1 (2006), this court held that admitting a graphic photograph was necessary to the medical examiner to help explain the analysis of the cause of death. There, the medical examiner determined that the cause of death was asphyxia, but could not determine the exact manner in which the asphyxia occurred because of a lack of physical evidence.

We also agree that the photographs are relevant for corroboration of other evidence. In *State v. Sutton*, 256 Kan. 913, 921, 889 P.2d 755 (1995), this court upheld the admission of photographs, stating: "[P]hotographs taken where the body was found were introduced to corroborate the testimony of a law enforcement officer who described the appearance of the body, the clothing, and the surrounding ground." As in *Sutton*, the photographs here corroborated the testimony of Detective Barron, who described the body, the clothing, the turned-out pocket, and the surrounding area.

They also corroborated Baker's admission that he and Hollingsworth had removed Owen's shoes and socks.

Finally, we agree with the State that the trial court did not abuse its discretion in admitting the photographs after weighing their probative value against their prejudice. We have reviewed the photographs in the record on appeal; they are not gruesome and hardly more upsetting than Egyptian mummies displayed in a museum.

Issue 3: *The prosecutor did not commit reversible misconduct when explaining the concept of aiding and abetting to the jury.*

Baker next argues the prosecutor committed misconduct in his closing argument because his sports team analogy misstated the law of aiding and abetting. Accordingly, Baker asserts that this erroneous portrayal of the law was outside the considerable latitude given a prosecutor and this misconduct violated his right to a fair trial. The State responds that the prosecutor's analogy, taken in context with his description of the evidence, does not misstate the law and there is no reversible misconduct.

Our standard of review is well known:

"Allegations of prosecutorial misconduct require a two-step analysis. First, the appellate court must determine whether the comments were outside the wide latitude allowed in discussing the evidence. Second, the appellate court must decide whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial, thereby requiring reversal." *State v. White*, 284 Kan. 333, Syl. ¶ 1, 161 P.3d 208 (2007).

The part of the prosecutor's closing argument to which Baker objects is as follows:

"My daughter plays on a ball team. She's not a starter, she is what we would call a benchwarmer. She may get in for 40 seconds in a game, she may get in for a minute in the game and that may be it, but she's part and parcel of that team. When that team wins and she only plays 40 seconds, she gets the win too. When that team loses and she only plays 40 seconds, she's part of the loss. Doesn't matter that she doesn't play the whole time of the game. Doesn't matter that she didn't make a basket, *it doesn't matter that she didn't get into the game,* she rises and falls as part of the team. And what you have in this case is a team of individuals that for various reasons decided to kidnap David Owen." (Emphasis added.)

We begin by addressing the elements of the crime, kidnapping, for which Baker was convicted of aiding and abetting, and then the elements of aiding and abetting. Kidnapping is defined in K.S.A. 21-3420(c) as "the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person . . . to inflict bodily injury or to terrorize the victim or another."

Aiding and abetting is defined in K.S.A. 21-3205(1) as follows: "A person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels, or procures the other to commit the crime." We have held that to establish guilt on the basis of aiding and abetting, the State is required to show that a defendant knowingly associated with the unlawful venture and participated in such a way as to indicate that he was facilitating the success of the venture. See *State v. Green*, 280 Kan. 758, 761, 127 P.3d 241, *cert denied* 549 U.S. 913 (2006). However, "[w]ithout other incriminating evidence, mere presence in the vicinity of the crime or mere association with the principals that committed the crime is not sufficient to establish guilt as an aider or abettor." 280 Kan. at 761-62.

We agree that, standing alone, the prosecutor's argument that "it doesn't matter that she didn't get into the game," could be construed to suggest that "mere presence" or "mere association" is sufficient to convict of aiding and abetting, which is clearly contrary to law. Before concluding there is such a misstatement, however, we must read the prosecutor's statement in the context of the entire closing argument. *Cf. State v. Edgar*, 281 Kan. 47, 63-65, 127 P.3d 1016 (2006) (context of closing argument reviewed and determined that misstatement of law not purposeful). Our review reveals that the prosecutor repeatedly emphasized that Baker did more than just sit on a team bench. Rather, he intentionally and knowingly joined and assisted the team. Rather than set forth the entire argument, a few examples will suffice.

The prosecutor emphasized Baker's decision to retrieve the rope from the tent to give to Hollingsworth and how Baker chose, at that time, to aid the kidnapping:

"Charles calls for a rope. I need some rope. Doesn't tell anybody you better bring me some rope, he says, I need some rope. Nobody had to bring him that rope, but who got involved in that team, in that joint venture at that point in time? Carl Baker went to his tent and he got a rope out of his tent and he got that bushwhack machete and he put it down by his belt. He takes that rope, he joins the team at the point in time and he gives that rope to John Cornell. John didn't have to take it, but John did and he took that rope because he also wanted to become a part of that team for whatever reason."

The prosecutor further highlighted Baker's conduct in helping remove Owen from the camp as an intentional and knowing act to aid:

"Charles Hollingsworth decides this dude has got to die. He rolls a cigarette, Carl Baker rolls a cigarette. He asks Carl Baker to help him. Carl does what he does. Once again, he joins that team. Wasn't enough that he provides the rope, he's joining that team in that effort."

The prosecutor also stressed that Greene had entered the camp and chosen not to join the team. He contrasted Greene's mere presence with Baker's decision to assist in the commission of the crime:

"Ron Greene comes in the camp at that point in time. . . . Ron eventually leaves. He doesn't join the team. He made a conscious effort, I'm not getting involved in this and I'm leaving and that's what he did."

The prosecutor also highlighted what Baker said in both his reenactment video and interview, *i.e.*, that he actually assisted Hollingsworth and that his motive for doing so and then not telling the police was that he did not want to go back to the penitentiary. He did not want Owen calling the police for the same reason. As a result, he actively participated as part of the team:

"Carl can't have him [Owen] call the cops. Carl is wanted. He told—you heard it. He told Detective Hill, *I didn't tell the cops because I didn't want to go back to the penitentiary and that's why I helped Charles because I didn't want to go back to the penitentiary.* You know, when you're part of a team, you get the win, you get the loss. When you're part of a corporation, the good years you make some monies and the bad years, you take a loss. When you're part of a joint venture to commit a crime, you're part and parcel. You are in it for a penny, you're in it for a pound regardless of the extent of the defendant's involvement in the actual commission of the crime.

"Aiding and abetting; it may not seem fair to hold this defendant responsible for the kidnapping and murder of David Owen because, after all, *all he did you may be thinking is he got the rope and he gave it to John and he helped drag him out there. . . . The facts of the case are that Carl assisted, he aided, he helped in all these endeavors. . . .* Once you are in, once you're in the group, the actions of Charles are your actions. Doesn't matter that you didn't tie David up, *you helped drag him down there to the tree.* Whatever Charles did is your responsibility too." (Emphasis added.)

The prosecutor repeated this refrain and commented on the actual evidence of Baker's assistance in his rebuttal closing:

"[L]et's talk about [what] Charles says, this dude has got to die. You know, you don't have to be an English major to understand what that means. . . . *And he [Hollingsworth] asks Carl to help him drag him down there and Carl does. . . . There are choices, there are actions.* Carl joined the crime in this case.

. . . .

"*Carl made a choice. . . . Charles said, this dude has got to die, he* [Baker] *made a choice to help him in that crime. . . .* He didn't have to become involved. He could have sat there, he could have let John grab a rope, take the rope to Charles. He could have let Charles drag him out or get somebody else to drag him out. He didn't have to do a thing. Would he have been morally guilty, yes. But he wouldn't have been criminally responsible. He could have sat there and decided not to do a thing.

"Choices. Carl Baker made a choice in this case." (Emphasis added.)

There are not only numerous references to Baker's actions in assisting in the crimes—as opposed to a mere presence, *i.e.*, sitting on the bench and not getting in the game—but we also observe that the parties agree that the jury instruction given on aiding and abetting correctly stated the law. See PIK Crim. 3d 54.05, Notes on Use. For these reasons, we conclude that the isolated reference to sitting on the bench did not misstate the law and was not outside of the wide latitude given the State when discussing the evidence.

Our conclusion is buttressed by *Wesley v. United States,* 547 A.2d 1022, 1029-31 (D.C. 1988), where the court addressed a similar sports analogy in a prosecutor's closing argument on aiding and abetting. Specifically, the prosecutor analogized the defendant's participation in the crime to the lack of playing time of a former backup quarterback for the Washington Redskins football team when it won the Super Bowl. Like the instant case, the defendant argued that the analogy misstated the law on aiding and abetting

and prejudicially suggested that mere presence was sufficient to convict without any intent to assist or evidence of conduct in furtherance of the crime.

The prosecutor had stated that quarterback "Bob Holley *sat on the bench for that entire time*. He didn't play a single solitary down for that game. . . . *Just sitting on that bench*, being ready was what he was doing that day. . . . Every member of that team, ladies and gentlemen, got their Super Bowl rings, all right. It wasn't just the people who played." (Emphasis added.) 547 A.2d at 1029-30.

As we have done, the *Wesley* court observed that the prosecutor had stressed that the defendant was "assisting" the "team" as a member and emphasized the "combined effort" of the Redskins team. 547 A.2d at 1030. This combined effort was then compared to the effort between the defendant and his colleague. The court held that "the analogy, although not completely parallel, included enough of the elements of aiding and abetting to avoid being misleading." 547 A.2d at 1030. It further noted, as in the instant case, that the judge correctly instructed the jury that more than mere presence was required and that "[t]he instructions were clear enough to dispel any notion that a conviction for aiding and abetting could be satisfied by mere presence." 547 A.2d at 1031.

While the *Wesley* court did not follow our analytical framework for reviewing possible prosecutorial misconduct as articulated in *White*, 284 Kan. 333, it appears to have addressed our threshold inquiry: whether the argument misstated the law and thus was outside the latitude afforded a prosecutor. It expressly held that the argument "avoid[ed] being misleading," and ultimately concluded that "the prosecutor engaged in no misconduct in her closing argument." 547 A.2d at 1030-31.

*Wesley* did not address another argument raised by Baker. He asserts that aiding and abetting is a specific intent crime, citing *State v. Johnson*, 258 Kan. 475, 485, 905 P.2d 94 (1994). According to him, the defendant must therefore intend for the criminal venture to succeed. Baker contends that the State's analogy to a sports team negates the importance of specific intent and instead suggests that aiding and abetting is a general intent crime.

As noted, both parties agree that jury instruction No. 15, which was taken from PIK Crim. 3d 54.05, correctly stated the law on aiding and abetting. We first observe that in *State v. Hunter*, 241 Kan. 629, 639, 740 P.2d 559 (1987), we held that PIK Crim. 2d 54.05 (same language as its successor) clearly informs the jury that intentional acts by a defendant are necessary to sustain a conviction for aiding and abetting. We further observe that Baker's jury was told through instruction No. 13 that "[a]s used in these instructions the following words and phrases are defined as indicated: 'Intentionally' means conduct that is purposeful and *willful* and not accidental. Intentional includes the terms '*knowing*,' 'purposeful,' and 'on purpose'." (Emphasis added.) In *State v. Sterling*, 235 Kan. 526, 529, 680 P.2d 301 (1984), after acknowledging that aiding and abetting required specific intent, we held that to prove that crime, "the prosecution had the burden of showing that the defendant *willfully and knowingly* associated himself with the criminal acts of McDaniel [the codefendant] and *willfully* participated in them." (Emphasis added.)

Given these correct statements of the law in the instructions, and our review of the closing argument, we are unable to conclude that the sports team analogy negated the specific intent that aiding and abetting required. The prosecutor repeatedly referenced Baker's choice to assist the team. Moreover, Baker never denied assisting; rather, he openly admitted supplying the rope with which Owen was bound and admitted helping drag Owen from the camp to his eventual death near the river.

Because we hold that the prosecutor did not mislead, *i.e.*, did not misstate the law of aiding and abetting, we need go no further in our misconduct analysis. See *State v. Kraus*, 271 Kan. 810, 817-22, 26 P.3d 636 (2001). There was no misconduct, much less any that was reversible.

Issue 4: *The trial court did not erroneously impose an enhanced sentence.*

For his last claim of error, Baker argues that the trial court erred by using his prior convictions in calculating his criminal history score. More particularly, he argues that the convictions were re-

quired to have been proven beyond a reasonable doubt before a jury.

This court first addressed this question in 2002 and concluded that the use of criminal history scores is not unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). *State v. Ivory*, 273 Kan. 44, 46-47, 41 P.3d 781 (2002) (including prior criminal convictions in Kansas Sentencing Guidelines Act criminal history score is constitutional); see *State v. Gonzalez*, 282 Kan. 73, 113-18, 145 P.3d 18 (2006). We see no reason to retreat from that position now.

Affirmed.