NOT DESIGNATED FOR PUBLICATION

No. 114,861

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

GABRIEL A. PATTERSON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Douglas District Court; PAULA B. MARTIN, judge. Opinion filed July 28, 2017. Affirmed.

*Sam Schirer*, of Kansas Appellate Defender Office, for appellant.

*Kate Duncan Butler*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before STANDRIDGE, P.J., LEBEN, J., and PATRICIA MACKE DICK, District Judge, assigned.

*Per Curiam*: While hanging out at a bar, one of Gabriel A. Patterson's friends hatched a plan to rob some small-time drug dealers. Patterson stayed close as his friends concocted their scheme and gathered weapons. Patterson ultimately recruited another man to help with the robbery. After the men finalized the plan, Patterson concealed his face and the group headed over to the apartment they planned to rob. Patterson stepped inside the apartment and waited by the front door in the living room as three of his companions beat, threatened, and robbed their victims. The State charged Patterson with

1

several crimes, and a jury convicted him of three counts of aggravated robbery and one count of aggravated burglary. He appeals his conviction and sentence. Finding no error, we affirm.

FACTS

One night in November 2014, roommates Kendri Salmons and Christopher Adams ran into a mutual acquaintance at a bar in Lawrence. The acquaintance, Yusef Kindell, asked if Adams had any marijuana, as Adams and his roommates each dealt small amounts of drugs. In fact, Kindell previously had come to Adams' apartment to buy the party drug ecstasy from Adams. After their encounter with Kindell, Salmons and Adams left the bar to smoke marijuana and spend time with friends at home.

At the same time, and unbeknownst to the roommates, Kindell and his friends hatched a plan to rob them. Kindell and Cody Kukuk previously had joked about robbing Adams' apartment a handful of times. After Kindell saw Adams at the bar that night, he and Kukuk started planning a burglary. Kukuk texted others, including Driskell Johnson, about joining them. Kukuk asked Johnson to bring a gun. Kukuk's good friend Patterson, who was at the bar with Kindell and Kukuk, remained nearby throughout the entire planning period.

The men continued planning after they arrived back at Kukuk's house. Patterson said he saw gloves, a knife, and a handgun on the table at Kukuk's house. Patterson also said they were calling other people in an attempt to get another person to participate. Zachary Pence, who ultimately did participate, testified that Patterson was the person who called and invited him to join in the robbery. Patterson claimed that he did not call Pence to get involved and that it was Kukuk who used his phone for that purpose; however, when Pence called back, Patterson admitted he answered the call and relayed to the group that Pence wanted them to come and get him. Patterson admitted he went with

2

the others to pick up Pence. Patterson told police that Pence was invited to join them because he's "crazy," and that Pence was "probably just an extra body or something," "muscle."

The agreed-upon plan was for Kukuk, Johnson, and Pence to keep the people inside the apartment out of the way while Kindell and Patterson "[took] stuff." Most of the men, Patterson included, concealed their faces. Kukuk carried a broken chair leg as a weapon, and Johnson had an unloaded gun. Together, the five walked from Kukuk's residence to the apartment, where Pence broke the door in by ramming it with his shoulder. Pence entered the apartment first, followed by Johnson and Kukuk. All three of these men went up the stairs towards the bedrooms while Patterson and Kindell stepped inside the house and waited by the front door in the living room.

There were four victims in the apartment that night:  the three male roommates (Shubhankar Mathur, Adams, and Salmons) and Mathur's girlfriend, Jacqueline Wells. All were asleep at the time the five men entered the apartment. Pence, Kukuk, and Johnson confronted the residents of the apartment separately, and there was evidence at trial of the following:

- Johnson hit Salmons with the gun, cutting a gash in Salmons' head and causing him to scream, but no property was taken directly from Salmons.

- Kukuk, Johnson, and Pence broke into Mathur and Wells' bedroom, threatened them, and took from them approximately $140, some marijuana, and their cell phones.

- Kukuk, Johnson, and Pence then went to Adams' room, where Kukuk hit Adams several times with the wooden stick while demanding money and marijuana.

3

Adams surrendered a safe, which Kukuk took. The safe later yielded marijuana and cash.

- As Kukuk, Johnson, and Pence were leaving the apartment, Pence punched Mathur in the eye and Johnson took an X-Box console from the living room.

While Pence, Kukuk, and Johnson were upstairs, Patterson remained positioned just inside the front door in the living room. Patterson stated in an interview with police officers that "[Johnson] was just cracking people. . . . He was just so on fire, like he was so mad," and that he heard screaming coming from upstairs, someone yelling, "I'm sorry" and "I don't have any weed." Patterson told police that when he heard the screaming, he thought, "This is not ideal," and that the people "shouldn't be screaming that bad." Patterson said that one of the men who lived in the apartment came downstairs, saw him standing by the door, and then went into the living room:  "He didn't see [my face] or anything. . . . I made sure nobody could." At that point, Patterson went outside the apartment to wait for the others.

From outside, Patterson saw Pence throw a cellphone from an upstairs window or balcony, and it was at that time Patterson decided to leave. Patterson said to police, "After it got really bad . . . I was the first person to leave." Patterson stated that he was afraid someone would get "split open." Patterson said he was sorry "as soon as [he] heard screaming." Patterson told police that he decided to leave because it got too violent, "I just felt like that wasn't what I pictured it was gonna go down like in my mind."

Patterson ran back to Kukuk's house, and the other four men arrived 1 or 2 minutes after him. Kindell had the safe and Johnson had the X-Box console and the gun. Patterson told police that when the other men returned, they were "pumped up" on adrenaline and gave him the safe to open. The men talked about what had just transpired, and one of the details revealed was that Johnson had "pistol whipped" someone.

Patterson admitted that he opened the safe with a knife and that they discovered a couple of ounces of marijuana and approximately $1,500 in cash inside the safe once it was opened. Another man who was at the house when the five men returned, Michael Thurman, divided the money between the men, keeping a cut for himself; Thurman knew about the crimes, but had not participated, and Patterson was unsure why Thurman received a portion of the money. Patterson said that after they split the money, he went home.

The victims notified the police. Wells recognized Pence because he had not concealed his identity, and she and Pence had attended the same high school. Wells identified Pence by name to police officers called to the scene. Later that same day, Pence was arrested. Pence entered into a plea arrangement in exchange for information regarding the other four men involved in the crimes. Officers recovered the broken safe and the chair leg from Kukuk's home. Later, Patterson texted Kindell to tell him Pence had been arrested for the burglary. A day or two later, Patterson again contacted Kindell, this time saying that he and Kukuk had left town. The Lawrence police eventually caught up with Patterson in California.

The State charged Patterson with four counts of aggravated robbery and one count of aggravated burglary. The State later amended the information to drop one count of robbery and add a count of aggravated battery. The case proceeded to a jury trial, where Kindell testified that Patterson stayed with the group throughout the planning and execution of the robbery. Kindell also testified that Patterson never objected, attempted to stop the others, or thwarted the plan in any way.

Like Kindell, Pence remembered Patterson being present during the planning stages. In fact, Pence specifically recalled that Patterson called him to help in the first place. He also remembered Patterson and Kindell standing at the front door while he, Johnson, and Kukuk raided the apartment.

Johnson testified that other than leaving briefly to deal with his girlfriend, Patterson remained with the group as they discussed the robbery. He also recalled driving past the apartment with Patterson and others before they actually carried out their plan. Pence and Johnson remembered Patterson riding along to pick up Pence, and no one recalled Patterson protesting or backing out of the robbery at any time. Johnson characterized Patterson as generally agreeing with the plan.

The jury convicted Patterson of all but the aggravated battery charge. The district court granted Patterson's motion for downward departure to a controlling sentence of 22 months and ordered joint and several liability with the other four codefendants for restitution in an amount of $1,496.13. The district court found that a firearm was involved in the crimes and that Patterson was aware that a firearm was involved in the crimes, and so ordered that Patterson be required to register as a violent offender for 15 years.

ANALYSIS

Patterson raises four issues on appeal: (1) the prosecutor committed reversible error by arguing to the jury that it could find him guilty of aiding and abetting based on the fact that he opened the safe, an act which occurred after the crimes were complete; (2) the court violated his constitutional rights under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), by failing to have the jury determine whether a deadly weapon was involved in committing the crimes at issue here; (3) the criminal statutory scheme under which he is required to pay restitution is unconstitutional in that it bypasses a victim's right to a civil jury trial for damages; and (4) the court violated his constitutional rights under *Apprendi* by failing to have the jury make any factual findings necessary related to the court's order requiring him to pay restitution. We address each of the issues raised by Patterson in turn.

1. *Prosecutorial error*

At trial, the State's theory of the case revolved around Patterson as an aider and abettor. In other words, the State argued that even if Patterson never handled the gun or entered the apartment, he aided, assisted, and encouraged the others to participate. While outlining this theory in her closing argument, the prosecutor said,

> "[I]n determining [whether Patterson intentionally aided another in committing the crimes], you can consider all the evidence of what the defendant did before, during, and immediately after."

The prosecutor continued from there, highlighting Patterson's role in the planning, his presence during the actual crime, and his prying open the safe; then she discussed evidence of his mindset and consciousness of guilt.

Patterson alleges the isolated portion of the State's argument urging the jury to consider Patterson's behavior after the crime (specifically, his opening the safe) amounts to prosecutorial reversible error. Patterson made no objections to the State's closing argument at trial; however, such an objection was not necessary to preserve the issue for appeal. A claim of prosecutorial error based on comments made during voir dire, opening statements, or closing argument (that are not evidence) will be reviewed on appeal even when a contemporaneous objection was not made at the trial level. *State v. Anderson*, 294 Kan. 450, 461, 276 P.3d 200 (2012); see *State v. Roeder*, 300 Kan. 901, 932, 336 P.3d 831 (2014) (statements during closing argument). Further, a misstatement of controlling law must be reviewed on appeal, regardless of a timely objection at trial, to protect a defendant's right to due process. When a misstatement of controlling law is made deliberately, it is outside the considerable latitude given to prosecutors during their arguments. *State v. Gunby*, 282 Kan. 39, 63, 144 P.3d 647 (2006).

Recently, our Supreme Court reevaluated several years of caselaw and established an improved two-step framework for evaluating claims of prosecutorial error. *State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016).

> "These two steps can and should be simply described as error and prejudice. To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). We continue to acknowledge that the statutory harmlessness test also applies to prosecutorial error, but when 'analyzing both constitutional and nonconstitutional error, an appellate court need only address the higher standard of constitutional error.' [Citation omitted.]" *Sherman*, 305 Kan. at 109.

In support of error, Patterson claims the prosecutor misstated the law by arguing to the jury that it could consider the behavior of a defendant after a crime has been committed to determine whether a defendant shares liability for the crime with the principal under an aiding and abetting theory of prosecution. Patterson cites to *State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006), which he argues stands for the legal proposition that a defendant's behavior after the crime can never be considered in an aiding and abetting case. But Patterson's reliance on *Davis* is misplaced, as both the facts and the law are readily distinguishable from the facts and law presented here.

8

In *Davis*, the defendant claimed the district court erred in failing to give an instruction directing the jury to consider the testimony of an accomplice witness with caution. PIK Crim. 3d 52.18 pertains to accomplice witness testimony and specifically provides that it applies to witnesses who testify that they were "'involved in the commission of the crime with which the defendant is charged.'" 283 Kan. at 576. Davis argued the instruction was factually proper because the witness testified that she was involved in events that occurred after the crime was committed, which made her an accessory after the fact. But the court disagreed, holding that a witness who qualifies only as an accessory after the fact is not enough to warrant an accomplice witness instruction. In order for an accomplice witness instruction to be factually proper, the court held that there must be evidence that the witness participated in the crime with which the defendant is charged. *Davis*, 283 Kan. at 577-80 (although witness may have been involved with events after the murder, only evidence at trial regarding witness' whereabouts and involvement was offered by witness herself, who testified that she was *not* present at time of the murder and there was no evidence that she otherwise participated in the planning or commission of the murder other than the events that occurred after the murder). In *Davis*, the court had to decide whether a witness was an accomplice to determine if an accomplice witness jury instruction was legally and factually proper. The decision we must make here, however, is if a defendant's actions after a crime are relevant to whether that defendant shares liability for the crime as an aider and abettor.

An individual aids and abets another—and is therefore criminally liable for that person's crime—if he or she "advises, hires, counsels or procures the other to commit the crime or intentionally aids the other in committing the conduct constituting" that crime. K.S.A. 2016 Supp. 21-5210(a). That individual must also act "with the mental culpability required for the commission" of the crime in question. K.S.A. 2016 Supp. 21-5210(a). As presented in the jury instructions, the State pursued the theory that Patterson "intentionally aid[ed] another to commit the crime."

9

Many Kansas cases have considered what behaviors constitute aiding and abetting. Specifically, "the law requires that the person knowingly associates with the unlawful venture and participates in a way which indicates that such person is furthering the success of the venture." *State v. Baker*, 287 Kan. 345, Syl. ¶ 7, 197 P.3d 421 (2008). As such, "[m]ere association with the principals who actually commit the crime or mere presence in the vicinity of the crime is itself insufficient to establish guilt as an aider and abettor." 287 Kan. 345, Syl. ¶ 7. However, "'if from the facts and circumstances surrounding the defendant's presence at the time and from the defendant's conduct it appears that the defendant's presence did in fact encourage someone else to commit the criminal act, guilt may be inferred.'" *State v. Bland*, 33 Kan. App. 2d 412, 417-18, 103 P.3d 492 (2004). If there is no direct evidence showing that the defendant planned "'to encourage, incite, aid, abet, or assist in the crime,'" the jury is still permitted to consider the defendant's failure "'to oppose the commission of the crime in connection with other circumstances'" and to therefore conclude "'that the [defendant] assented to the commission of the crime . . . and thereby aided and abetted the commission of the crime.'" 33 Kan. App. 2d at 418. With that said, "failing to stop or report a crime is not the basis for liability under an aider and abettor theory" without additional indicators of the defendant's intention to "further[] the success of the venture.'" *State v. Simmons*, 282 Kan. 728, 738, 148 P.3d 525 (2006).

Based on the applicable law as cited above, we find the prosecutor did not err by arguing to the jury that it could consider the fact that Patterson opened the safe in deciding whether Patterson was guilty of the crimes charged under an aiding and abetting theory. In making this finding, we acknowledge that opening the safe is not an element of the underlying crimes of aggravated burglary or of aggravated robbery and that Patterson opened the safe after the crimes were complete. But to prove the burglary charge in this case, the State needed to show that Patterson shared the intent to commit a theft inside the apartment. Theft requires an intent to permanently deprive. See K.S.A. 2016 Supp. 21-5801(a). Patterson's help opening the safe, removing the money, and keeping his share of

10

the proceeds is the clear evidence of this intent. Patterson's concession that he opened the safe and took his cut of the marijuana and money found inside—which he knew had just been stolen from the victims' apartment—is relevant evidence from which a jury could conclude that Patterson was not merely present in the vicinity of the crimes committed but instead intentionally associated with the unlawful venture and participated in a way which indicated that he was furthering the success of the venture. See *Baker*, 287 Kan. 345, Syl. ¶ 7. Because it is relevant to Patterson's intent, the prosecutor did not misstate the law by telling the jury they could consider as a factor Patterson's conduct immediately after the crimes in determining his culpable state of mind. See *Sherman*, 305 Kan. at 109.

And contrary to the characterization of events in his appellate brief, Patterson did not stand idly by while his companions plotted and carried out the robbery. Patterson participated in or at least listened extensively to the planning stages of the robbery. Patterson watched as Kukuk and Johnson armed themselves. Pence testified that it was Patterson who called to ask him to participate in the crime, and Patterson admitted he went with the others to pick Pence up after Pence agreed to take part in the robbery. Patterson also admitted that he knew Pence was invited to join them because he's "crazy," and would provide "an extra body" and "muscle." After the men finalized their plan, Patterson concealed his face and accompanied the others to the apartment. Patterson and Kindell stepped inside the apartment and waited by the front door in the living room as Pence, Kukuk, and Johnson rushed inside. Patterson admitted that as he stood guard, "[Johnson] was just cracking people. . . . He was just so on fire . . . so mad," and that he heard screaming coming from upstairs, someone yelling, "I'm sorry" and "I don't have any weed." Patterson also reported that when one of the men who lived in the apartment came downstairs and saw him standing by the door, he made sure the resident could not see his face. At no time did Patterson protest, back out, object, or disapprove of the plan to rob Adams, Salmons, and Mathur. From the initial planning stages until the distribution of the proceeds, the evidence at trial demonstrates Patterson intended to

11

associate with the unlawful venture and to participate in a way which would further the success of the venture. See *Baker*, 287 Kan. 345, Syl. ¶ 7.

2. *Registration requirement*

Patterson next argues that the district court violated his Sixth and Fourteenth Amendment rights under *Apprendi* when it found that the crimes of conviction had been committed with a deadly weapon and ordered him to register as a violent offender. Patterson acknowledges that he never raised this issue with the district court. Generally, constitutional grounds for reversal asserted for the first time on appeal are not properly before the appellate court for review. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). There are several exceptions to this general rule, and review of an issue raised under *Apprendi* is considered one of these exceptions "to prevent the denial of a fundamental right." *State v. Wheeler*, No. 114,518, 2016 WL 5853090, at *1 (Kan. App. 2016) (unpublished opinion), *petition for rev. filed* October 28, 2016.

Whether a defendant's constitutional rights have been violated is a question of law that we review without any required deference to the district court. *State v. Unrein*, 47 Kan. App. 2d 366, 369, 274 P.3d 691 (2012). Under the Kansas Offender Registration Act, a district court can order a defendant to register as a violent offender if (among other reasons) the defendant is convicted of a person felony and the court makes a finding on the record that a deadly weapon was used in the commission of that person felony. K.S.A. 2016 Supp. 22-4902(e)(2). In this case, Patterson was convicted of three counts of aggravated robbery and one count of aggravated burglary, and the district court found that a deadly weapon was used to commit those crimes, so it ordered him to register as a violent offender for the next 15 years. *Apprendi* held that because of the Sixth Amendment right to a jury trial and the Fourteenth Amendment right to due process, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved

12

beyond a reasonable doubt." 530 U.S. at 476-85, 490. So Patterson argues that the district court violated *Apprendi* because ordering him to register as a violent offender increased the penalty for his crime and was based on a court finding that had not been proved to a jury beyond a reasonable doubt.

But Patterson's argument is grounded in the legal principle that registration as a violent offender constitutes punishment. If registration is not punishment, then *Apprendi* does not apply. Our court has held on several occasions that a registration requirement does not increase the penalty for a crime beyond the legal maximum because registration is separate from and does not impact the length of a defendant's sentence. *Unrein*, 47 Kan. App. 2d at 372; *State v. Chambers*, 36 Kan. App. 2d 228, 238-39, 138 P.3d 405 (2006). Based on those cases, requiring a defendant to register as a violent offender, even when the finding that triggers registration is made by the court rather than a jury, does not violate *Apprendi*. *Unrein*, 47 Kan. App. 2d at 372; *Chambers*, 36 Kan. App. 2d at 238-39.

Whether our prior rulings on this question are still good law is put in some doubt by our Supreme Court's ruling in *State v. Charles*, 304 Kan. 158, 178, 372 P.3d 1109 (2016). In that case, the Kansas Supreme Court reached the opposite conclusion, holding that because a registration requirement qualifies as a type of punishment, imposing registration effectively increases the penalty for a crime. *Charles*, 304 Kan. at 178. Under this reasoning, imposing registration without a jury finding that the defendant used a deadly weapon would violate *Apprendi*. But once the Kansas Supreme Court gives an indication that it is departing from its own precedent, we are no longer bound to follow that precedent. *Heartland Presbytery v. Presbyterian Church of Stanley, Inc.*, 53 Kan. App. 2d 622, Syl. ¶ 10, 390 P.3d 581 (2017). And the Kansas Supreme Court has given a strong indication that *Charles* is not good law anymore. The ruling in *Charles* was based on a case published on the same day, *Doe v. Thompson*, 304 Kan. 291, 373 P.3d 570 (2016), overruled by *State v. Petersen-Beard*, 304 Kan. 192, 377 P.3d 1127 (2016). *Thompson*, a four-to-three decision, held that the registration requirement was a type of

13

punishment; therefore, the Ex Post Facto Clause of the United States Constitution applied to prevent retroactive application of amendments to the registration statutes. 304 Kan. 291, Syl. ¶ 7. But *Thompson* was overruled on the day it was issued: *Petersen-Beard*, with a different four-judge majority, held that the registration requirement could not be challenged as cruel and unusual punishment under either the United States or the Kansas Constitutions because it was not a type of punishment. 304 Kan. 192, Syl. ¶¶ 1-2.

*Petersen-Beard* did not expressly overrule *Charles*, but it did expressly overrule *Thompson*. And in *Charles*, the court noted that the *Petersen-Beard* holding—which is the exact opposite of the *Thompson* holding that *Charles* relied on—"may influence whether the [registration-requirement] holding of this case is available to be relied upon by violent offenders whose appeals have yet to be decided." *Charles*, 304 Kan. at 179. So while *Charles* is exactly on point and has not been expressly overruled, we have an indication, both from the *Charles* court and from the differently constituted *Petersen-Beard* court, that the Supreme Court is departing from the position that an *Apprendi* violation occurs when the court requires a defendant to register based on its finding that a deadly weapon was used in the felony of conviction. See *State v. Secrest*, No. 115,565, 2017 WL 543546, at *4-5 (Kan. App. 2017) (unpublished opinion), *petition for rev. filed* March 9, 2017; *State v. Brown*, No. 114,808, 2016 WL 7429424, at *8-9 (Kan. App. 2016) (unpublished opinion), *petition for rev. filed* January 18, 2017.

For the reasons stated above, we conclude that *Charles* is no longer good law. Thus, the district court did not violate *Apprendi* when it found that a deadly weapon was used in the commission of Patterson's felony convictions. See *Secrest*, 2017 WL 543546, at *5 (no *Apprendi* violation in these circumstances); accord *State v. Perez-Medina*, No. 114,589, 2017 WL 262025, at *6 (Kan. App. 2017) (unpublished opinion), *petition for rev. filed* February 21, 2017; *Brown*, 2016 WL 7429424, at *8-9; *Wheeler*, 2016 WL 5853090, at *3; *State v. Campbell*, No. 114,167, 2016 WL 3407598, at *6 (Kan. App. 2016) (unpublished opinion), *rev. denied* April 26, 2017.

3. *Restitution and the common-law right to civil jury trial*

Patterson argues that the Kansas criminal restitution scheme is facially unconstitutional because it encroaches on a criminal defendant's common-law right to a civil jury trial without offering anything in return. Patterson acknowledges that he did not raise this issue before the district court. He did not object to any portion of his sentence at sentencing and did not dispute the amount of restitution ordered.

Constitutional grounds for reversal asserted for the first time on appeal are not properly before an appellate court for review. *Godfrey*, 301 Kan. at 1043. However, there are three exceptions to this rule: (1) The newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) consideration of the theory is necessary to serve the ends of justice or to prevent the denial of fundamental rights; and (3) the judgment of the district court may be upheld on appeal despite its reliance on the wrong ground or having assigned a wrong reason for its decision. *State v. Phillips*, 299 Kan. 479, 493, 325 P.3d 1095 (2014). Patterson contends that this court should review the merits of his claim because two exceptions apply: the issue only involves a question of law arising on proved or admitted facts that is finally determinative of the case, and the consideration of the claim is necessary to serve the ends of justice or to prevent a denial of his fundamental rights. The State argues that Patterson should be prohibited from raising this argument for the first time on appeal because he did not raise it below and, in the alternative, the argument is without merit.

Patterson concedes in his brief that a panel of this court previously held the issue he raises was not reviewable for the first time on appeal. *State v. Jones*, No. 113,044, 2016 WL 852865, at *9 (Kan. App. 2016) (unpublished opinion), *petition for rev. filed* March 30, 2016. The *Jones* court disagreed that either exception was applicable:

"The first exception does not apply because the determination of Jones' restitution claim is not finally determinative of the case. The second exception does not apply because it cannot be argued that consideration of the issue is necessary to serve the ends of justice or to prevent a denial of fundamental rights when Jones did not even object to the imposition of or the amount of restitution at sentencing. See *United States v. Dudley*, 739 F.2d 175, 179 (4th Cir. 1984) (appellate court refused to consider restitution issue for first time on appeal when defendant failed to object to restitution in district court). Therefore, we reject Jones' constitutional issue as not properly preserved for appellate review." 2016 WL 852865, at *9.

See also *State v. Bradwell*, No. 115,153, 2016 WL 7178771, at *4 (Kan. App. 2016) (unpublished opinion) (following *Jones*). Like in *Bradwell*, a determination of Patterson's restitution claim is not finally determinative of his criminal appeal, and Patterson did not object to his sentence or the restitution ordered; therefore, the issue is not properly preserved for appellate review.

4. *Restitution as punishment*

Finally, Patterson argues that the Kansas criminal restitution scheme is punitive, as it requires a mandatory minimum amount of money to be determined by a judge, and thus violates *Apprendi*. Patterson again acknowledges that he did not raise this issue to the district court. Suggesting that the Kansas criminal restitution scheme is a sentencing scheme, and therefore appropriate for an *Apprendi* challenge, Patterson argues that review is proper because consideration of the issue involves only a question of law arising on proved or admitted facts that is finally determinative of the case and is necessary to serve the ends of justice or to prevent a denial of his fundamental rights. The State contends that, in light of the holdings in *Jones* and *Bradwell*, Patterson's claimed exceptions are inapplicable.

The *Jones* court addressed this same issue and Jones' failure to raise it to the district court:

> "Again, Jones failed to raise this issue before the district court, and we find no applicable exception to address the issue for the first time on appeal. Although we decline to address the merits of Jones' claim, we note in passing that this court previously has held that the imposition of restitution in a criminal case does not implicate *Apprendi*. See *State v. Huff*, 50 Kan. App. 2d 1094, 1103-04, 336 P.3d 897 (2014), *rev. denied* 302 Kan. [1015 (2015)]." 2016 WL 852865, at *9.

While Patterson attempts to distinguish *Huff* from the facts of this case, he fails to acknowledge the weight of caselaw that distinguishes restitution orders from sentencing schemes reviewable under *Apprendi*. See, *e.g.*, *United States v. Burns*, 800 F.3d 1258, 1261-62 (10th Cir. 2015) (*Apprendi*'s rule has no application to restitution). As restitution does not implicate *Apprendi*, no exceptions apply to warrant review of this issue for the first time on appeal.

Affirmed.